[Nos. A039402, A043283. First Dist., Div. Two. Dec. 20, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LESLIE BRIGHAM, Defendant and Appellant.

In re LESLIE BRIGHAM on Habeas Corpus.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1(a), the introduction and sections I, II, III, IIIA, and IV *only* of this opinion and the dissent shall be published.

**COUNSEL**

Paula Rudman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Aileen Bunney and Morris Beatus, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PETERSON, J.**—Appellant, who was convicted of first degree murder as an aider and abettor, argues that the instructions given the jury did not explain either his defense theory or the proper scope of vicarious liability. He also contests the court's ruling on his motion to exclude prejudicial evidence, as well as its determination that he suffered a serious felony conviction in New Mexico. Together with the appeal is a petition for a writ of habeas corpus which asserts that newly discovered evidence requires a new trial. We will modify the judgment by striking the five-year enhancement, affirm the judgment as modified, and deny the request for a writ of habeas corpus.

## I. STATEMENT OF THE CASE

An information charged Leslie Brigham (appellant) with the first degree murder of Hosea Barfield. (Pen. Code, § 187.) It additionally set forth two enhancement allegations: that appellant personally used a firearm and inflicted great bodily injury on the victim, and that appellant had been convicted of a serious felony for which he received probation in New Mexico. (Pen. Code, §§ 12022.5, 667.) Appellant pleaded not guilty and denied both enhancement allegations.

A jury convicted appellant of first degree murder, but found that he did not personally use a firearm or inflict great bodily injury. Appellant waived a jury trial on the enhancement allegation of prior serious felony conviction, and the court found it true. The court sentenced appellant to prison for 25 years to life on the murder conviction, with a consecutive 5-year term for the prior.

Appellant filed a timely notice of appeal. He also filed a petition for a writ of habeas corpus which is being considered together with his appeal.

## II. STATEMENT OF FACTS

On the evening of January 21, 1986, Barbara Dawson and her cousin Catherine Barfield experienced car trouble while parked on East 14th Street, near 61st Avenue. Mrs. Barfield, who lived in the nearby 65th Village, telephoned her husband and 14-year-old son Hosea Barfield (Barfield), who both agreed to come help. As the two women walked back to the disabled car after making the phone call, they saw Barfield across the street walking along East 14th to meet them. Barfield was playfully calling out and hiding behind telephone poles.

After the two women crossed the street and reached the car, Ms. Dawson started to unlock the door. She saw a man wearing dark clothes and a ski mask pulled down over his face come around the corner. The man lifted a rifle-type gun and shot it several times. Ms. Dawson ducked down, then flagged a passing car. She did not see the man when she got up. She identified an AR-15 military rifle as being most like the gun she saw, choosing it over an HK-93 assault rifle.

As Ms. Dawson approached the driver's side, Mrs. Barfield went to join her son at the passenger side. She noticed a clicking noise, turned, and saw a man with a dark ski mask covering his face and a rifle-type gun in his hands standing by the corner barbershop. Barfield told her to run, and she saw the gun fire as she fled. After calling the police from a store, Mrs. Barfield returned to find her son dead on the sidewalk.

The driver of the car Ms. Dawson flagged down testified that, as he was driving down East 14th on the night of the killing, he heard shots as he approached 61st. He looked to his left and saw a man crouched down and running. The man seemed to be wearing a drab-colored army jacket with a fur collar. He could not see the man's face or hands.

A pathologist testified that Barfield had at least three, possibly more, gun shot wounds to his neck, back, arm, and chest. He had extensive internal injuries in his chest and brain. The police recovered three spent .223 caliber casings at the scene. A ballistics expert said they could have been fired by either an AR-15 or an HK-93. In his opinion, the bullets had not been fired from an HK-93.

Nearly nine months after the murder, when the police investigation had reached a dead end, appellant approached an Oakland police officer and asked to talk to a homicide investigator regarding a "mistaken identity murder" on East 14th Street. Appellant voluntarily spoke with the head of the Barfield homicide investigation, Officer Harris. After a preliminary interview, he was admonished about his rights and made two taped statements. The jury heard both tapes and received transcripts of them.

Appellant recounted the events surrounding the murder. That night, he and a number of men had gathered at a recreation center. Norbert Bluitt (Bluitt) and Dual Moore (Moore) were part of the group; another member was someone appellant refused to identify and referred to throughout the interview as "The Man." Also present were appellant's nephew, Daryl Reed, and Ricky Jester. Appellant described Jester as "da man that's sittin' on all the cocaine[ ] [o]n Ninety Fourth." (Officer Harris was sure "The Man" was appellant's nephew, a cocaine dealer.) Someone came to the

recreation center to give "The Man" information about an enemy named "Chuckie," a former associate of Felix Mitchell (Mitchell) who was a notorious Oakland drug dealer. "The Man" had held a grudge against Chuckie for some time. Appellant considered Chuckie an enemy of his group, and stated his belief that "The Man" thought "[Mitchell] [then alive in prison] was gonna have [someone] do it to 'The Man,'" and that "they was out to kill me."

Appellant was an experienced hit man. He described his modus operandi as it concerned the ski mask he wore on such "missions" in these terms: "[O]nly time I will put the ski mask on my face, when I'm tryin' ta hit, kill somebody." Appellant knew Bluitt because they had "worked together before[ ] [w]ith [Mitchell]" and knew Bluitt was "just hardheaded."

"The Man" arranged to have automatic weapons, referred to as "choppers," delivered to appellant and Bluitt, and ordered them to kill Chuckie. Appellant referred to his fully automatic weapon as an HK-9;[1] Bluitt had a similar gun; Moore possessed a handgun. All were provided with gloves so as to leave no fingerprints. The three left to find Chuckie, with Moore driving. Appellant was wearing dark clothes and a rolled-up ski mask. Bluitt wore a baseball cap marked with an "N," which he pulled down low over his face. Officer Harris testified that Moore told him Bluitt was wearing some sort of dark gray hood. Both Ms. Dawson and Mrs. Barfield testified that the killer was not wearing a baseball cap.

Appellant described the venture as a mission. When they reached the 65th Village where Chuckie was supposed to be, it was quite dark. This hit team's vehicle was parked, and they went on foot "in the back way" to where a group of men was present on a porch; the group on the porch started to scatter, presumably having been warned that "some[thing] is gonna go down."

The hit team started following one of the departing group, ran back to get in their car, went in the car toward East 14th on 64th Avenue and by a place known as Plucky's, and "[t]here was a young guy right there." When appellant first saw Barfield from the hit team's car, "I say yeah, he is Chuckie. That is Chuckie." Bluitt "just said [']we're gonna get him.[']" Appellant, when the car got close to Chuckie, then said, "man, that is not Chuckie, man." Bluitt responded, "we're gonna get him." Bluitt directed the driver to make a right turn and stop. Although appellant contended he told Bluitt that Barfield was not Chuckie, after the vehicle stopped,

---

[1] Testimony of a ballistics expert indicated appellant must have been referring to an HK-93 as there is no HK-9 gun.

appellant, like Bluitt, exited the vehicle carrying his automatic weapon, remained out of the vehicle with that weapon for about 15 seconds, took the weapon with him to the street corner near where the shooting occurred, and saw an officer in a police car. He returned his gun to the car and told Bluitt, before the shots were fired by Bluitt: "[P]olice right there, man. Don't do it. It ain't cool. That's not the dude, man. Come on. And he [Bluitt] say, ['M]an, fuck dat. We's gonna waste it up. We's gonna let dese niggers know we serious.[']" Although appellant said he attempted to grab his arm, Bluitt then fired more than twice, hitting Barfield in the face.

At the end of the interview, appellant identified photographs of Bluitt, Moore, and the AR-15 rifle which Bluitt carried and which Ms. Dawson identified as the murder weapon.

## III. DISCUSSION

■ The major issue we must decide here is this: Where the proof offered to support a criminal charge, prosecuted on the theory the defendant knowingly and intentionally aided and abetted a criminal act of a perpetrator, contains evidence of an *uncharged* criminal conspiracy between aider and abettor and his principal/perpetrator, is the aider and abettor relieved of derivative criminal liability as a matter of law if that criminal act of the perpetrator is an "independent product" of his mind, and is outside and not in furtherance of the criminal offense the aider and abettor originally agreed to aid or facilitate?

We will hold that in such circumstances the aider and abettor is not relieved of liability as a matter of law, because his derivative criminal liability continues to be factually determined by the test of whether the criminal act committed by the principal was a natural and probable (or foreseeable) consequence of an act the aider and abettor knowingly aided, encouraged, or facilitated.[2]

---

[2] The lower court instructed the jury through the use of the following aiding and abetting instructions: "The persons concerned in the commission of a crime who are regarded by law as principals in the crime thus committed and equally guilty thereof include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet *in* the commission of the crime. [¶] One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and probable consequences of any act that he knowingly and intentionally aided or encouraged. [¶] It is for you, the jury, to determine whether the defendant is guilty of the crime allegedly *committed,* and if so, whether the crime charged was a natural and probable consequence of the criminal act knowingly and intentionally *aided or* encouraged. [CALJIC No. 3.00 (1987 rev.) (mod.) (4th ed. 1987 pocket pt.) p. 34, emphasis denotes modification; now CALJIC Nos. 3.00 and 3.02.]

"A person aids and abets in the commission of a crime when he or she, [¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of

 Consequently, the trial court was not required to give CALJIC No. 6.15 (fn. 3, *infra*) or to engraft its language onto CALJIC No. 3.00 (now CALJIC Nos. 3.00 and 3.02) in this aiding and abetting case.

Appellant and our dissenting colleague urge that in such circumstances the law concerning conspiracy must be applied,[3] sua sponte if no request therefor is made by the defense, so as to further instruct the jury of acts of the principal that cannot, *as a matter of law,* be a natural and probable consequence of his criminal act; i.e., acts that are found to be "an independent product" of the principal's own mind, and that differ from and do not further and are outside the offense knowingly and intentionally aided and abetted.

No conspiracy was charged in this case. The evidence was capable of being interpreted to support a conspiracy between Bluitt and appellant. The prosecution introduced such conspiracy evidence in support of the appellant's murder charge, prosecuted on an aider and abettor theory of derivative liability. No contention is made that the evidence was insufficient to support appellant's resulting murder conviction.

### A. *No Error Was Committed by Refusal of Conspiracy Instructions or Their Equivalent*

CALJIC No. 3.02 (formerly CALJIC No. 3.00), as here pertinent, defines the derivative criminal liability of an aider and abettor (see fn. 2, *supra*). CALJIC No. 6.15, as here pertinent, excludes any derivative criminal liability of a passive coconspirator where the act of a conspirator is an independent product of his own mind and is outside the common design and not a furtherance of that design (see fn. 3, *supra*).

---

committing, encouraging, [or facilitating the commission of the offense,] by act or advice, aids, promotes, encourages, or instigates the commission of a crime. [¶] A person who aids and abets in the commission of a crime need not be personally present at the [scene] of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and [the] failure to prevent it does not amount to aiding and abetting. [CALJIC No. 3.01 (1984 rev.) (4th ed. 1987 pocket pt.) pp. 35-36.]

"One who has aided and abetted the commission of a crime, with knowledge of the unlawful purpose of the perpetrator of the crime, may end his responsibility for the crime by notifying the other party or parties of whom he has knowledge of his intention to withdraw from the commission of the crime and by doing everything *reasonable under the circumstances* in his power to prevent its commission. [CALJIC No. 3.02 (1979 rev.) (mod.) (4th ed. 1979) italics denotes modification; now CALJIC No. 3.03.]"

[3] CALJIC No. 6.15 or a derivative of the same. This instruction provides: "No act or declaration of a conspirator that is an independent product of [his] [her] own mind and is outside the common design and not a furtherance of that design is binding upon [his] [her] co-conspirators, and they are not criminally liable for any such act." (5th ed. 1988.)

Appellant reasons that the derivative crimes of conspiracy and aiding and abetting have been recognized by precedent to be closely intertwined, that virtually all aiding and abetting crimes involve conspiracy or elements thereof, that the use of conspiracy instructions in aiding and abetting cases has been previously approved by appellate courts of this state, and that the lower court's failure to give CALJIC No. 6.15 or its functional equivalent left the jury without guidance as to appellant's trial theory.[4]

We have neither found nor been cited to any California case expressly dealing with the issue of the existence of reversible error under such circumstances.

### 1. The Semantical Confusion in Aiding and Abetting Cases

The treatment of derivative criminal liability has been the subject of extensive comment.[5] The disparity in terminology used to express derivative liability has been sometimes confusing. *People* v. *Kauffman* (1907) 152 Cal. 331, 335-337 [92 P. 861] held the evidence sufficient to support findings that defendant was a member of a "combination or conspiracy," and thus sufficient to support defendant's conviction as an aider and abettor.

However, in *People* v. *Durham* (1969) 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198], an aider and abettor prosecution, the Supreme Court took pains after citing *Kauffman* to emphasize by footnote "that the resort to language of conspiracy in cases such as that under consideration *does not refer to the crime of that name but only to the fact of combination as it has relevance to the question of aiding and abetting in the commission of the charged crime*." (*Id.*, 70 Cal.2d at p. 182, fn. 9, italics added.)[6]

*People* v. *Rogers* (1985) 172 Cal.App.3d 502 [217 Cal.Rptr. 809] makes this cryptic analysis: "The causal terminology used in these cases varies

---

[4] Appellant does not contend error in instructing on *withdrawal* from the commission of Bluitt's crime. CALJIC No. 3.03 (formerly CALJIC No. 3.02) on that point was given to the jury (see fn. 2, *supra*). The verdict indicated any withdrawal contention was rejected. (See *People* v. *Ross* (1979) 92 Cal.App.3d 391, 404-405 [154 Cal.Rptr. 783].)

[5] See Sayre, *Criminal Responsibility for the Acts of Another* (1930) 43 Harv.L.Rev 689; Kadish, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine* (1985) 73 Cal.L.Rev. 323.

[6] The dissenter in *People* v. *Luparello* (1986) 187 Cal.App.3d 410, 452, footnote 2 [231 Cal.Rptr. 832], points out that an aider and abettor is derivatively liable for an act which is the "probable and natural" consequence of the originally contemplated crime (*People* v. *Kauffman, supra*, 152 Cal. at p. 334), for the "natural and reasonable consequences of the acts he knowingly and intentionally aids and encourages . . . ." (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318]), and for "any reasonably foreseeable offense committed by the person he aids and abets." (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].)

inexplicably. *Beeman* uses the words 'natural and reasonable consequences.' (35 Cal.3d at p. 560.) It got them from *People* v. *Beltran* [1949] 94 Cal.App.2d [197] [210 P.2d 238] which also used 'natural and probable' in the same breath. *(Id.,* at p. 206.) [*People* v. ] *Slaughter* [(1984) 35 Cal.3d 629 (200 Cal.Rptr. 448, 677 P.2d 854)], in similar fashion, used 'natural and reasonable consequences' and 'natural and probable consequence' as interchangeable. (35 Cal.3d at p. 660.) This conflation of apparently disparate notions displays a striking indifference to the language. We do not understand in what sense reasonable and probable are equivalents, or for that matter what a 'reasonable consequence' is. It has been observed that 'the description of the reaction as "natural" means that it is in accordance with human nature, not abnormal, while "probable" must be taken as meaning "not unlikely." ' (Hart & Honore, Causation in the Law (1959) p. 140.) Notwithstanding these semantic peculiarities, we are not free to speculate about their impact upon the jury verdict. *Language approved by the Supreme Court was embodied in the instruction* and [defendant] makes no claim that it misled the jury to his prejudice." (P. 515, fn. 17, italics added.)

Despite this criticism, however, it is clear that taken together the instructions given by the lower court in the case at bench (fn. 2, *supra*), as *People* v. *Rogers, supra,* 172 Cal.App.3d 502, observed, contain language approved by the Supreme Court in *People* v. *Beeman, supra,* 35 Cal.3d 547, and *People* v. *Croy, supra,* 41 Cal.3d 1, and the change of language suggested by *People* v. *Hammond* (1986) 181 Cal.App.3d 463, 468-469 [226 Cal.Rptr. 475].

2. Relevant Evidence of Charged or Uncharged Conspiracies May Prove Derivative Criminal Liability of an Aider and Abettor

It is equally clear that juries have, for many years, been required to apply relevant evidence of *charged* conspiracies in proof of the aiding and abetting of a charged crime, even when that evidence is insufficient to support a conspiracy conviction.

In *People* v. *Villa* (1957) 156 Cal.App.2d 128 [318 P.2d 828], a seminal case written by then Presiding Justice Peters of Division One of this court and extensively relied on by the Supreme Court in *People* v. *Durham, supra,* 70 Cal.2d 171, the salient facts were these.

Villa, the appellant, and two others were charged with rape, violation of Penal Code section 288a (section 288a),[7] robbery, and conspiracy to commit all these crimes. He was acquitted of the rape and all three conspiracy charges. Although he did not directly participate in either the section 288a

---

[7] Unless otherwise indicated, all subsequent statutory references are to the Penal Code.

or the robbery, he was convicted on both those charges. His conviction was upheld as an aider and abettor.

"The crime of *aiding and abetting*[8] is a separate and distinct offense from that of conspiracy. [Citation.] Although the rape and conspiracy charges involved some of the same acts as were involved in the section 288a Penal Code and robbery charges, the acquittal on the first two charges [rape and conspiracy] does not affect the validity of the conviction on the other two charges. . . . [I]n considering the sufficiency of the evidence to sustain the conviction on the section 288a of the Penal Code and robbery counts[,] *the court must consider all of the evidence, including the relevant portions of the evidence relating to the rape and conspiracy charges.*" (*People* v. *Villa, supra,* 156 Cal.App.2d at p. 133, italics added.)[9]

Unlike the case at bench, *Villa* dealt with a prosecution on both conspiracy and aiding and abetting theories, and observed an aider and abettor may be guilty of a crime without having previously conspired to commit it.

It is logically certain from *Villa* as approved by *Durham* that a jury, bound to consider relevant evidence of a charged conspiracy in support of a charge of a crime committed by aiding and abetting (which evidence may be insufficient to support a conspiracy conviction), is equally bound to consider relevant evidence of an uncharged conspiracy for the same purpose.

"Conspiracy principles are often properly utilized in cases wherein the crime of conspiracy is not charged in the indictment or information. In some cases, for example, resort is had to such principles in order to render admissible against one defendant the statements of another defendant. [Citations.] In others evidence of conspiracy is relevant to show identity through the existence of a common plan or design. [Citation.] In still others the prosecution properly seeks *to show through the existence of conspiracy that a defendant who was not the direct perpetrator of the criminal offense charged aided and abetted in its commission.* [Citations.]" (*People* v. *Durham, supra,* 70 Cal.2d at pp. 180-181, fn. 7, italics added.)

In such instances, the function of offering proof of the uncharged conspiracy is simply evidentiary, as those facts tend to prove the crime charged. *Durham* does not suggest that use of such proof in any class of cases it

---

[8]This statement appears to contain a misnomer. Aiding and abetting is not a criminal offense. It is one means by which derivative liability for commission of a criminal offense is imposed.

[9]The appellate court, of course, could only so consider such evidence on a contention of its lack of sufficiency if the jury could consider it at trial.

discusses requires a modification of the instruction defining the crime charged, or the standard of proof of its elements.

### 3. Appellant's Proposed Instructions Were Improper

Appellant's attempt to engraft the conspiracy instructions we have discussed (CALJIC No. 6.15, fn. 3, *ante*) on to the aider and abettor instructions the court gave (fn. 2, *ante*) must wholly fail as foreign to the law of aider and abettor liability for the reasons we now consider.

Appellant contends an aider and abettor's derivative liability must be vitiated if, among other things, the criminal act charged is an "independent product" of the mind of the perpetrator.[10]

The ultimate factual question to be determined on the issue of an aider and abettor's derivative liability has always been held by the Supreme Court to be the test of whether the perpetrator's criminal act, on which the aider and abettor's derivative criminal liability is based, was the "probable and natural" (*People* v. *Kauffman, supra,* 152 Cal. at p. 334), the "natural and reasonable" (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560), or the "reasonably foreseeable" (*People* v. *Croy, supra,* 41 Cal.3d at p. 12, fn. 5) consequence of a criminal act encouraged or facilitated by the aider and abettor. The variations in the adjectives the court has used to describe "consequence" have never changed the basic structure and meaning of the test. Its resolution is within the ken of a jury as a question of fact for it to decide,[11] and one on which its determination is conclusive. (*People* v. *Villa, supra,* 156 Cal.App.2d at p. 134; *People* v. *Durham, supra,* 70 Cal.2d at pp. 181, 182-183; *People* v. *Kauffman, supra,* 152 Cal. at p. 335.)

The Supreme Court has never said or implied as a derivative of these principles, or otherwise, that the ultimate focus of a jury's inquiry must be directed to whether a principal's act on which an aider and abettor's derivative criminal liability turns is an "independent product" of the principal's own mind. To the contrary, the ultimate jury analysis of aider and abettor

---

[10]The dissent poses this instruction as one to be given in aider and abettor cases in support of appellant's position, although appellant did not offer it at trial: "No reasonably unforeseeable act or declaration of a perpetrator that is an independent product of his own mind and is outside the offense which the defendant knowingly and intentionally aided and abetted and not a furtherance of that offense is binding upon the defendant, and the defendant is not criminally responsible for any such act."

[11]After *People* v. *Hammond, supra,* the CALJIC aiding and abetting instructions were amended to clarify the jury's duty "to determine whether the act committed was in fact a natural and probable consequence of the criminal act knowingly and intentionally encouraged." (181 Cal.App.3d at p. 469; cf. *People* v. *Jones* (1989) 207 Cal.App.3d 1090, 1096, and fn. 2 [255 Cal.Rptr. 464].)

liability in a case such as this hinges neither on whether the principal's criminal act was intentional, nor on whether it differed from a criminal offense the aider and abettor agreed to facilitate.

The derivative criminal liability of an aider and abettor for a perpetrator's crime may exist even though that crime was unintended by the aider and abettor. The principal committing the crime and his aider and abettor need not possess the same intent in order to be criminally responsible for the committed crime. (*People* v. *Luparello, supra,* 187 Cal.App.3d at p. 439.)

A subjective inquiry as to whether the perpetrator's committed crime was the "independent product" of his mind, so as to lead to exculpation of the aider and abettor on that basis, is improper because the ultimate factual determination of the jury as to the liability of an aider and abettor is based instead on an objective analysis of causation; i.e., whether the committed crime was the natural and probable consequence of the principal's criminal act the aider and abettor knowingly encouraged or facilitated.

Appellant's proposed instructions were, thus, properly refused.

**4. The Court Had No Sua Sponte Duty to Instruct on the Theory Appellant Proposed.**

Appellant additionally urges the lower court nonetheless had a sua sponte duty, once appellant's defense strategy allegedly became apparent, to instruct the jury that the conspiracy principles of CALJIC 6.15 applied to the case.

Appellant contends such instruction would equitably bring the factual standards of determining liability for the derivative crimes of conspiracy and aiding and abetting into parity. Our dissenting colleague agrees, perceiving an inequity in applying the limitation on derivative liability of CALJIC No. 6.15 to conspiracy but not to aiding and abetting.

**a. Prosecutorial Discretion in Charging Crimes**

Part of appellant's argument for the compulsory utilization of conspiracy instructions in the instant and like cases is this: Appellant urges that the People's election to prosecute a case solely as an aiding and abetting crime, which case is equally susceptible of a conspiracy prosecution, removes unfairly the conspiracy defenses he would otherwise assert by CALJIC No. 6.15; and the consequent unfairness of this prosecutorial election must be balanced by allowing the use of CALJIC No. 6.15 in all aiding and abetting

cases where evidence of an uncharged conspiracy is presented but conspiracy is not charged.

◼ The Legislature, our Supreme Court, and this court (Div. Two), as well as other appellate courts in California, have recognized that the prosecutor, not the court or the defendant, exercises the discretion to decide which crimes will be charged and on what theory they will be prosecuted. Government Code section 26500 provides the prosecutor "shall attend the courts, and *within his or her discretion* shall initiate and conduct on behalf of the people all prosecutions for public offenses." (Italics added.) The courts have repeatedly indicated this prosecutorial discretion is a fundamental principle of our criminal justice system. "Prosecutors have broad decisionmaking power in charging crimes." (*Sundance* v. *Municipal Court* (1986) 42 Cal.3d 1101, 1132 [232 Cal.Rptr. 814, 729 P.2d 80].) "The district attorney must be vested with discretionary power in investigation and prosecution of such charges." (*Taliaferro* v. *City of San Pablo* (1960) 187 Cal.App.2d 153, 154 [9 Cal.Rptr. 445].) "There can be no question but that discretion permeates the entire process of bringing charges against a person suspected of having committed a crime. And it is the district attorney who is vested with discretionary power to determine whether to prosecute. [Citation.] *There is no review by way of the appellate process of such a decision . . . ."* (*People* v. *Adams* (1974) 43 Cal.App.3d 697, 707-708 [117 Cal.Rptr. 905], italics added.) Our Supreme Court has also cautioned against court action unduly trammeling the prosecutor's decisionmaking process, which "would improperly interfere with the prosecutor's free exercise of discretion *to determine what if any criminal charges should be brought against particular individuals.* [Citations.]" (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 148-149 [137 Cal.Rptr. 14, 560 P.2d 1193].)

b. The Causation Principles Underlying Aider and Abettor Derivative Criminal Liability

◼ In examining appellant's principal claim of sua sponte duty to instruct on the conspiracy principles urged, we return to the causation principles of aider and abettor liability. ◼ An aider and abettor's derivative liability for a principal's criminal act has two distinct prongs: First, the aider and abettor is liable for the particular *crime* that to his knowledge his confederates are contemplating. Second, the aider and abettor is also liable for the natural and probable consequences *of any criminal act* he knowingly and intentionally aids and abets, in addition to the specific and particular crime he and his confederates originally contemplated.

This derivative criminal liability of an aider and abettor centers on causation. The law's policy is simply to extend criminal liability to one who

knowingly and intentionally encourages, assists, or influences a criminal act of another, if the latter's crime is naturally and probably caused by (i.e., is the natural and probable consequence of) the criminal act so encouraged, assisted, or influenced.

■ "[T]he concept of agency explains a great deal about why we feel justified in punishing an accomplice as if [he] were the perpetrator. . . . [Citation.]" (*People* v. *Luparello, supra,* 187 Cal.App.3d at p. 440.)

"Technically, only the perpetrator can (and must) manifest the mens rea of the crime committed. Accomplice liability is premised on a different or, more appropriately, an equivalent mens rea. [Citation.] This equivalence is found in *intentionally* encouraging or assisting or influencing the nefarious act. '[B]y intentionally acting to further the criminal actions of another, the [accomplice] voluntarily identifies himself with the principal party. *The intention to further the acts of another, which creates liability under criminal law, may be understood as equivalent to manifesting consent to liability under the civil law.*' [Citations.]" (*Id.,* 187 Cal.App.3d at p. 439, second italics added.)

■ Thus, in *People* v. *Croy, supra,* 41 Cal.3d at page 12, footnote 5, the Supreme Court uses terms associated with causation in interpreting its decision in *People* v. *Beeman, supra,* 35 Cal.3d at page 560. The *Croy* court said the principal act for which derivative aider and abettor liability is imposed is one which is a *"reasonably foreseeable offense"* (italics added) committed by the perpetrator as a consequence of the intentional and knowing encouragement or facilitation of a criminal act by the aider and abettor. The aider and abettor's liability "is *a question of legal causation* independent of any intention that the result obtain. [Citations.]" (*People* v. *Rogers, supra,* 172 Cal.App.3d at p. 515, italics added.)

The jury's factual determination, of what the natural and probable, or reasonably foreseeable, consequences of a principal's criminal act are, necessarily requires that jury to reject all crimes which are *not* such consequences.

The "natural and probable consequences" standard the jury is given in CALJIC No. 3.02 (formerly CALJIC No. 3.00), by which to render its verdict on derivative aider and abettor liability, presents an all-encompassing standard for proper lay application of law to relevant evidence on the issue of legal causation of a criminal act.[12]

---

[12] We see no need to revise the instruction sua sponte, as appellant requests, in an aider and abettor case to inform the jury, as the dissenter also urges, of any acts that *do* or *do not* constitute a natural and probable consequence of the criminal act encouraged or facilitated. A

Further, this case illustrates quite clearly the wisdom of rejecting an instruction such as the one the dissent proposes (see fn. 10, *ante*). That instruction would clearly have been erroneous on the issue of aider and abettor derivative criminal liability.

If the principal's criminal act charged to the aider and abettor is a reasonably foreseeable consequence of *any* criminal act of that principal, knowingly aided and abetted, the aider and abettor of such criminal act is derivatively liable for the act charged. The aider and abettor is not, therefore, exculpated as a matter of law from the act charged to him simply because it does not further the originally agreed criminal act or enterprise of the parties. The dissent's proposed instruction is erroneous because it would compel such exculpation on that rationale.

After association for a criminal purpose, a principal's subsequent criminal act, knowingly and intentionally aided and abetted, can be different from that which the associating parties first contemplated and yet produce a reasonably foreseeable result in the crime committed which is different from, and not in furtherance of, the criminal act first contemplated, as the record here illustrates.

Considering the evidence in the light most favorable to the verdict, as we must, appellant was an experienced assassin or hit man as was Bluitt. They had worked together in the past for Mitchell. Appellant and Bluitt considered "The Man" their boss and Chuckie, the intended victim, their enemy. Appellant thought Mitchell's group, which included Chuckie, was "out to kill [him]."

Because he had worked with Bluitt before, appellant knew he was "just hardheaded." By common lay understanding, one who is hardheaded may be foreseeably and irrationally difficult to dissuade or control once embarked on a criminal enterprise, whether under the goad of fear of the director of that enterprise or fear of the intended victim or for other reasons.

Appellant himself identified Barfield as Chuckie, the intended victim, to Bluitt from a passing auto and heard Bluitt say, "[W]e're gonna get him," moments before the fatal shots were fired. When their car stopped and after appellant claimed he had revised his decision Barfield was Chuckie and had so advised Bluitt, appellant nonetheless admitted he got out of the vehicle carrying his loaded automatic weapon as did Bluitt, saw an officer in a

---

potential list of all such acts would be mountainous; formula instructions would be improperly encouraged from case to case; and the jury's fact finding role would be impeded.

parked police car on the street nearby, and returned his weapon to his car. He told Bluitt: "[P]olice right there, man. Don't do it. It ain't cool. That's not the dude, man." The "hardheaded" Bluitt, who had been told by appellant moments before that Barfield *was* Chuckie, their intended victim, and who apparently ignored the presence of an officer and police car in that part of Oakland, said, "[M]an, fuck dat. We's gonna waste it up. We's gonna let dese niggers know we serious."

Thus, the evidence showed that both assassins were fearful of their enemies, including the intended victim; that the hardheaded and presumably erratic and uncontrollable nature of his co-assassin was previously known to appellant; that appellant himself identified Barfield as their target and took a loaded gun toward the target after he claimed he recanted this identification. Where the evidence showed the presence of police as a strong and reasonable motivating force in appellant's desire to leave the scene with Bluitt, the jury could arguably conclude that, even if Barfield's murder was a fresh and "independent product" of Bluitt's mind and even if that murder did not further the parties' original criminal agreement to kill Chuckie (which we do not concede), it was nonetheless a foreseeable result (a natural and probable consequence) of either the original appellant-Bluitt agreement to kill Chuckie, *or* of any of the criminal acts of Bluitt which were thereafter encouraged or facilitated by appellant. Bluitt's hardheaded and erratic nature and obstreperous attitude, as known to appellant and evident in the circumstances of this case where he killed a victim in the virtual presence of a police officer, could be reasonably foreseen to have made calling him off an assassination assignment, once set in motion, impossible because of a last minute retraction of the victim's identity as the target. He might have been reasonably foreseen to have viewed appellant's recanting of Barfield's true identification as a loss of resolve, because of the police presence or for other reasons. Appellant's identification of Barfield as Chuckie moments before the shooting, followed by appellant with his loaded weapon accompanying Bluitt toward a vantage point from which to shoot the victim before returning his weapon to their vehicle, may reasonably and foreseeably have been seen to induce Bluitt to ignore appellant's contention of Barfield's misidentification and to resolve all doubts of Barfield's identify by quickly shooting him (despite a police officer's presence in the vicinity), so as not to risk the censure of "The Man" for failure to carry out the mission.

Conversely, the jury could have concluded that Barfield's murder *did* further the parties' original agreement to kill Chuckie, since a concomitant part of that compact was necessarily the protection of "The Man" and the hit team from Mitchell's followers, and the terrorization of those followers through "wast[ing] it up" and firing weapons at or near such persons to show "we serious." The identity of the criminal compact of the principal

and aider and abettor and what is included within its scope are also questions of fact for the jury. *(People* v. *Villa, supra,* 156 Cal.App.2d at pp. 133-134; *People* v. *Durham, supra,* 70 Cal.2d at p. 181.)

We, thus, cannot accept the view that failure to give CALJIC No. 6.15 or to engraft conspiracy principles on the aiding and abetting instructions the court gave (see fn. 2, *supra*) deprived appellant of his right to present his theory of the case to the jury.

Our dissenting colleague asserts appellant's theory, justifying the refused instruction, was that he could not be held liable as an aider and abettor *because it was not reasonably foreseeable* his cohort (Bluitt) would intentionally act outside the scope of the criminal compact in a manner which did not further the purpose of that compact.

The answer to his assertion is this: The question of whether Barfield's killing was a "reasonably foreseeable" consequence of a criminal act, committed by Bluitt and knowingly and intentionally encouraged or facilitated by appellant, was adequately submitted to the jury by CALJIC No. 3.00 (now CALJIC Nos. 3.00 and 3.02), which substituted *"natural and probable"* for *"reasonably foreseeable"* in describing the "consequences" of the perpetrated criminal act on which appellant's liability could be based. Put another way, whether or not Bluitt's conduct was "reasonably foreseeable" is the equivalent of whether that conduct was a reasonable or natural and probable consequence of a criminal act of Bluitt which appellant agreed to and did encourage and facilitate. The Supreme Court has sanctioned the use of both emphasized terms as synonymous in the law of aiding and abetting.

We do not find the instructional error appellant and our dissenting colleague assert, and hold none was committed by the lower court. It instructed properly on all the relevant legal principles of this case *(People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]), and had here no sua sponte duty to give the instructions appellant sought or any derivative thereof since appellant's theory of defense was covered by the instructions given.[13]

---

[13] *People* v. *Garewal* (1985) 173 Cal.App.3d 285 [218 Cal.Rptr. 690], relied on by the dissent, is inapposite. It involved an alleged erroneous modification of CALJIC No. 6.11 (involving conspiracy) to provide that a natural and probable consequence of a coconspirator's act may exist, even through the act was not intended as part of the original plan, *"or was even actually forbidden as part of the original agreement . . . ." (Id.,* 173 Cal.App.3d at p. 299, italics in original.)

The emphasized portion of the instruction is supported by Witkin in this language: "[Vicarious] liability extends to acts unintended or even *actually forbidden,* if they are, nonetheless, in furtherance of the common purpose [of the conspiracy]." (1 Witkin and Epstein, Cal. Criminal Law (2d ed. 1988) § 181, p. 202, and cases cited.)

*Garewal* disapproved the emphasized portion of the challenged instruction on the ground it erroneously suggested one can anticipate as a " 'probable and natural consequence[ ] of the

B.-E.*

. . . . . . . . . . . . . . . . . . . .

IV. DISPOSITION

Appellant's request for a writ of habeas corpus is denied.

The judgment is modified by striking the five-year enhancement; it is affirmed as modified.

Smith, J., concurred.

**KLINE, P. J.,** Dissenting.—I respectfully dissent. The majority's analysis of the alleged instructional error misconstrues the law, misrepresents the real issue and misappropriates the function of the jury. Additionally, the majority creates doctrinal problems destined to plague an important area of our criminal law.

1.

The jury received the standard CALJIC instructions on aiding and abetting, which informed them that an aider and abettor is "liable for the natural and probable consequences of any criminal act that he knowingly and intentionally aided and abetted" and that it was the jury's task to determine whether the crime charged was a "natural and probable consequence of the criminal act knowingly and intentionally encouraged." (CALJIC No. 3.02.) The trial court refused a supplemental instruction appellant proposed in an attempt to present to the jury the theory, which he vigorously advanced, that he could not be held liable as an aider and abettor

---

object of the conspiracy' an act which was 'actually forbidden as part of the agreement.' " (173 Cal.App.3d at pp. 299-300.) The case states that vicarious criminal liability is limited "by the reasonable contemplation *of the defendant,*" and that a nonprincipal in a derivative liability criminal case may not have his vicarious liability extended to acts which are specifically *not* contemplated. (*Id.*, 173 Cal.App.3d at p. 300, italics added.)

Whatever the merits of *Garewal* as applied to a conspiracy prosecution (a position on which we express no view), the derivative liability of appellant here is measured on a causation theory; i.e., was the charged act a reasonable or probable and natural consequence of a criminal act knowingly and intentionally facilitated or encouraged, measured by an objective causation standard, not by the subjective standard of what the aider and abettor intended the end result of his facilitation or encouragement of a criminal act to be.

*See footnote, *ante,* page 1039.

of Hosea Barfield's murder if the jury found Bluitt intentionally fired at Hosea knowing he was not Chuckie and that this intentional act did not facilitate the crime appellant and Bluitt set out to commit. I agree with appellant that the refusal of such an instruction is reversible error.

The derivative liability of an aider and abettor for the "natural and probable consequences" of a criminal enterprise is indistinguishable from that imposed upon a defendant charged with conspiracy. Thus, with the same logic of CALJIC No. 3.02, pertaining to aiding and abetting, CALJIC No. 6.11 instructs that a member of a conspiracy is liable for "the natural and probable consequences of any act of a co-conspirator to further the object of the conspiracy." However, the standard conspiracy instructions also place a limit on derivative liability for "natural and probable consequences." CALJIC No. 6.15, which appellant asked to be given in this case with appropriate modifications, clarifies that "no act . . . of a conspirator that is an independent product of his own mind and is outside the common design and not a furtherance of that design is binding upon his co-conspirators, and they are not criminally liable for any such act."[1] This instruction correctly states the law. (*People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Werner* (1940) 16 Cal.2d 216, 223 [105 P2d 927]; *People* v. *Kauffman, supra*, 152 Cal. 331, 334.)

The "natural and probable consequence" rule of accomplice liability set forth in CALJIC No. 6.15, which is established in the criminal laws of most American jurisdictions, relates to the question of foreseeability. "Under this approach, if A counsels or aids B in the commission of a burglary or a robbery of C, and B encounters resistance from C and thus kills him in the course of the burglary or robbery, A is an accomplice to murder. On the other hand, if A is an accomplice in a scheme to steal a safe from a building, and one of the other parties, B, takes it upon himself to also rob the watchman in the building, A is not an accomplice to the robbery." (LaFave & Scott, *Handbook on Criminal Law* (1972 § 65, p. 516, citations omitted.)[2]

The majority holds that an instruction limiting derivative liability along the lines of CALJIC No. 6.15 is "foreign to the law of aider and abettor

---

[1] The proposition, which may be traced back to *People* v. *Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861], is similarly expressed in CALJIC No. 6.16, also requested by appellant at trial: "Where a conspirator commits an act which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and is bound by that act, and no responsibility therefor attaches to any of his confederates."

[2] LaFave and Scott are critical of the "natural and probable consequence" rule of accomplice liability, which they see as inconsistent with more fundamental principles of our system of criminal law. "It would permit liability to be predicated upon negligence even when the crime involved requires a different state of mind. Such is not possible as to one who has personally committed a crime, and should likewise not be the case as to those who have given aid or counsel." (*Ibid.*, fn. omitted).

liability" (maj. opn., p. 1050), reasoning that "[a] subjective inquiry as to whether the perpetrator's committed crime was the 'independent product' of his mind . . . is improper because [it is unrelated to] an objective analysis of . . . whether the committed crime was the natural and probable consequence of the [perpetrator's] criminal act . . . ." (Maj. opn., p. 1051.) If an instruction such as CALJIC No. 6.15 is for this reason foreign to the law of aider and abettor liability, then it must also be foreign to the law of conspiracy, which embodies precisely the same "natural and probable consequences" rule of accomplice liability.

As will be discussed presently, the majority fails to recognize that where, as here, there is an agreement between the perpetrator and the defendant, conspiracy and aiding and abetting are simply different ways of articulating the same theory of derivative liability. The standard of causation is not subjective in one instance and objective in the other; the ultimate question in both contexts is whether, *from an objective point of view,* the crime charged was the reasonably foreseeable result (i.e., the "natural and probable consequence") of the criminal enterprise embarked upon. It seems to me clear as a matter of common sense, as well as of law, that whether an intentional criminal act should be objectively anticipated by a defendant who was a party to a criminal compact may be closely related to whether the act was the independent product of the mind of his cohort, outside of and not in furtherance of their agreement.

The majority is, of course, correct that a person may be held criminally liable as an aider and abettor even if he did not intend the perpetrator's act nor share the intent of the perpetrator. However, these questions of intentionality beg the question of foreseeability. The fact that a defendant can be liable as an aider and abettor even though he did not intend the perpetrator's act nor share the perpetrator's intention does not render it logically or legally unnecessary to inquire whether the perpetrator's intentional act was reasonably foreseeable, and therefore a "natural and probable consequence" within the meaning of the aiding and abetting instructions.

2.

The majority concedes that the undisputed facts of this case show a conspiracy to murder and that if appellant had been charged with conspiracy the trial court would have given a form of the instruction unsuccessfully sought in this case. (CALJIC No. 6.15.) In order to justify the trial court's refusal to give such an instruction, the majority must identify some distinction between conspiracy and aiding and abetting pertinent to the principle articulated in the instruction in issue. The case law—which the majority

finds "confusing" (maj. opn., p. 1047)[3]—shows very clearly that no such distinction can be made.

Although, as will be seen, there are differences between aiding and abetting and conspiracy, they are for present purposes conceptually indistinguishable means to impose derivative liability. Conviction as an aider and abettor requires knowledge of the criminal purpose of the perpetrator and intent to commit, encourage, or facilitate the commission of the crime. (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) Conviction of a criminal conspiracy requires proof that the defendant and at least one other person specifically intended to agree or conspire to commit a crime, specifically intended to commit the crime, and carried out overt acts in furtherance of the conspiracy. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 789 [248 Cal.Rptr. 126, 755 P.2d 310], cert. den. 488 U.S. 1034 [(102 L.Ed.2d 980, 109 S.Ct. 848)]; CALJIC No. 6.10.5.) A person may be guilty as a conspirator or as an aider and abettor not only of offenses he intended to facilitate or encourage but of offenses that are the foreseeable consequences of the acts he knowingly and intentionally aided and encouraged. (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560.) The chief difference between the two doctrines is the required element of agreement in conspiracy.[4] Because this element is usually present when vicarious liability is at issue, most aiding and abetting cases could also be prosecuted as conspiracies and it is common to find cases in which conspiracy and aiding and abetting are presented as alternative or joint theories of liability.[5] The

---

[3] The footnote in *People* v. *Rogers* (1985) 172 Cal.App.3d 502, 515, fn. 17 [217 Cal.Rptr. 809], which the majority uses to show the confusion it finds in the case law, has nothing to do with whether aiding and abetting and conspiracy are based on the same or different theories of derivative criminal liability. All Justice Blease's footnote does is complain about "semantic peculiarities" common to discussions of "natural and probable consequences" that are as common in the conspiracy cases as in those involving aiding and abetting. The fact that, as pointed out in *Rogers,* the Supreme Court has approved instructions that use the phrase "natural and probable consequences," such as CALJIC No. 3.02, certainly does not mean that a trial court need never give clarifying instructions such as those requested in this case. Otherwise it would never be error to refuse CALJIC No. 6.15 in a conspiracy case, because CALJIC No. 6.11 is always given.

[4] It is because of this element that conspiracy, unlike aiding and abetting, may also be a crime in and of itself: The agreement to engage in criminal activity is considered a special threat to society and therefore punishable independently of the substantive offense. (See *Callanan* v. *United States* (1961) 364 U.S. 587, 593-594 [5 L.Ed.2d 312, 317, 81 S.Ct. 321]; *People* v. *Luparello* (1986) 187 Cal.App.3d 410, 437 [231 Cal.Rptr. 832]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 157, pp. 175-176.)

[5] *State* v. *Tally* (1893) 102 Ala. 25 [15 So. 722] provides the classic example of the unusual situation in which, because the element of agreement was missing, an aiding and abetting did not also involve a conspiracy. In *Tally,* the defendant instructed a telegraph operator not to deliver a telegram which had been sent to warn the victim of an intended killing. The warning telegram was not sent and the victim was killed; the defendant was liable as an accom-

element of agreement is critical because it bears directly upon the parties expectations of one another and thereby helps determine whether the charged criminal act was reasonably foreseeable. (E.g., *People v. Washington* (1969) 71 Cal.2d 1170 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]; *People v. Luparello, supra,* 187 Cal.App.3d 410; *People v. Garewal* (1985) 173 Cal.App.3d 285 [218 Cal.Rptr. 690].) As Learned Hand has put it, where there is such agreement, "a conspirator . . . is in substance the same thing [as] an abettor." (*United States v. Falcone* (2d Cir. 1940) 109 F.2d 579, 581, see also Perkins, *The Act of One Conspirator* (1974) 26 Hastings L.J. 337, 340.)

The Supreme Court has pointed out that "like a conspirator, [a person tried as an aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets." (*People v. Croy, supra,* 41 Cal.3d at p. 12, fn. 5, citing *People v. Beeman, supra,* 35 Cal.3d 547, 560.) Where, as here, there is evidence that the alleged conspirator or aider and abettor neither specifically intended nor contemplated the perpetrator's act, the most important factual question is whether the act committed was nonetheless a reasonably foreseeable result of the intended act.

An unintended act ordinarily is not a reasonably foreseeable result of a criminal scheme, according to the case law, if it is outside of and does not further the common objective. " '[T]he act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, *and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design. Even if the common design is unlawful, and if one member of the party departs from the original design as agreed upon by all of the members, and does an act that was not only not contemplated by those who entered into the common purpose, but was not in furtherance thereof, and not the natural or legitimate consequence of anything connected therewith, the person guilty of such act, if it was itself unlawful, would alone be responsible therefor.' "* (People v. *Kauffman, supra,* 152 Cal. 331, 334, italics added.)[6]

plice despite the fact that the killers had no knowledge of his effort to help them. See also, *People v. Villa* (1957) 156 Cal.App.2d 128 [318 P.2d 828], discussed, *ante,* at pages 1048-1049.

[6]*People v. Werner, supra,* 16 Cal.2d 216, exemplifies the situation in which vicarious liability cannot be imposed because the perpetrator's act was outside and not in furtherance of the criminal compact. The defendant in that case, who had been convicted with his wife of attempted grand theft from one McNeil, told McNeil they could have a criminal action against him dropped upon the payment of $2,500 to the district attorney and $10,000 to the prosecuting witness. Subsequently, without defendant's knowledge, his wife duplicitously told McNeil she would handle the matter and arranged a secret plan for McNeil to pass her the money. The couple was arrested after the wife received a fake payment. The court found the defendant could not be liable for attempted grand theft because, even assuming he intended

This principle, which is still good law,[7] is consistent with the view of the commentators who have addressed this issue, who take the view that derivative liability should not be imposed when the perpetrator intentionally commits an act which is outside the scope of the planned offense. (Kadish, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine* (1985) 73 Cal.L.Rev. 323; Williams, *Criminal Law: The General Part* (1961) § 135, pp. 401-402; see also, La Fave & Scott, Handbook on Criminal Law, *supra*, § 65, pp. 513-519.) According to Professor Kadish, derivative liability should not be imposed for an act which is too remote or too dependent upon the perpetrator's *volitional* act; thus, a second party, whether charged as a conspirator or as an aider and abettor, is clearly not liable when the first *intentionally* chooses a different victim than the one intended. (Kadish, *supra*, at pp. 366-367.) The situation is different if the perpetrator commits a different act than the one intended because of a mistake, as the party who encouraged or facilitated the intended crime should not be excused simply because the perpetrator made a mistake. (See, Williams, *Criminal Law: The General Part, supra*, § 135, pp. 401-402.) As stated by Professor Williams, "the alleged accessory is not responsible for a deliberate change of plan by the perpetrator, but is for his accident or mistake in carrying out the plan." (Williams, Textbook of Criminal Law (2d ed. 1983) § 15.9, p. 356.)

The idea that vicarious liability does not extend to intentional acts foreign to the common design was recently explored in *People* v. *Garewal, supra*, 173 Cal.App.3d 285. In that case the court reversed convictions prosecuted on both conspiracy and aiding and abetting theories because the court erroneously modified CALJIC No. 6.11 by adding to the following portion of the instruction the italicized language: " 'Every conspirator is legally responsible for an act of a coconspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan, *or was even actually forbidden as part of the original agreement* and even though he was not present at the time of the commission of such act.' " (*Id.*, at p. 299, italics in original.) As

to divert the money from McNeil to his own use, the act upon which the charge was based was performed by his wife under a secret agreement foreign to the common plan in which the defendant had participated.

[7] The majority inexplicably suggests that *Kauffman* is somehow limited by a footnote in *People* v. *Durham, supra*, 70 Cal.2d 171, stating that the language of conspiracy used in cases like *Kauffman* "does not refer to the crime of that name but only to the fact of combination as it has relevance to the question of aiding and abetting in the commission of the charged crime." (*Id.*, at p. 182, fn. 9.) I am at a loss to understand the significance my colleagues attach to this statement, because it is so obviously consistent with appellant's point. The fact of combination is relevant to the question of aiding and abetting where, as here, the defense claims that the charged act was not foreseeable because it was inconsistent with the purpose of the conspiracy, or where, conversely, the prosecution attempts to show the opposite by demonstrating that the charged act, though perhaps unintended, was nevertheless consistent with the purpose of the conspiracy.

a result of this instruction, the court explained, "the jury had to resolve but one question of intent concerning the substantive offenses: Did Garewal conspire to commit burglary? If so, he was automatically and strictly liable for all that followed, even acts contrary to the agreement with his cohorts." (*Id.*, at p. 299.) As the court observed, *Beeman* does not permit vicarious responsibility for certain crimes to be potentially predicated "on a theory of conspiracy to *commit a different crime. . . .*" (*Ibid.*, italics in original.)

The *Garewal* court, aware that the Supreme Court "mixes citations to conspiracy and aiding and abetting instructions without distinguishing between them" (173 Cal.App.3d at p. 301), recognized that though CALJIC No. 6.11 purports to apply to conspiracy it is perfectly consistent with the law pertaining to an aider and abettor's liability. (*Id.*, at p. 299.) The problem with the modified version of CALJIC No. 6.11 given in *Garewal* was that it suggested that one can anticipate as a " 'probable and natural consequence[ ] of the object of the conspiracy' " "an act which was 'actually forbidden as part of the agreement.' " (*Id.*, at pp. 299-300.) "Worse, it extends a relatively mild form of vicarious liability, one which is at least limited by the reasonable contemplation of the defendant, although perhaps not by his intent, to acts which are specifically *not* contemplated, much less intended." (*Id.*, at p. 300, italics in original.)

Although it is here the failure to give a correct instruction rather than the giving of an erroneous instruction that is assigned as error, the result is essentially the same as that warranting reversal in *Garewal*. The chief issue in this case was whether the killing of Barfield was in fact a natural and probable consequence of the plan to kill Chuckie; i.e., whether the killing of Barfield was reasonably foreseeable. Appellant's theory of the case was that the killing of anyone other than Chuckie was never contemplated nor conceivably advantageous and that it was therefore not reasonable to anticipate the deliberate commission of such an irrational act. The giving of CALJIC No. 3.02—which simply emphasized the importance of the question whether the crime charged "was a natural and probable consequence of [the] originally contemplated crime"—did not inform the jury whether, if it found that Bluitt's killing of Barfield was a wholly independent act outside the criminal enterprise originally agreed upon and not in furtherance of that enterprise, it could still be considered a natural and probable consequence of the criminal act appellant knowingly and intentionally encouraged. Although the jury in this case was not *misinformed,* as in *Garewal,* it was at least uninformed whether the defense theory, if factually sustained, was legally tenable.

The requirement that the unintended criminal act for which derivative liability is imposed be in furtherance of the common objective, which has

long roots in the common law,[8] was central to the defense in the present case. The fact that the standard instruction appellant proposed relative to this issue, CALJIC No. 6.15, is a standard conspiracy instruction does not mean it cannot be given in an aiding and abetting case. As I have been emphasizing, "[c]onspiracy principles are often properly utilized in cases wherein the crime of conspiracy is not charged in the indictment or information" (*People* v. *Durham, supra*, 70 Cal.2d 171, 180, fn. 7),[9] particularly in aiding and abetting cases. (*Ibid.*; accord, *People* v. *Belmontes, supra*, 45 Cal.3d 744, 789; *People* v. *Washington, supra*, 71 Cal.2d 1170, 1174; *People* v. *Pike* (1962) 58 Cal.2d 70, 88-89 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 447 [20 Cal.Rptr. 165, 369 P.2d 714].) In short, there is no justification for depriving a defendant prosecuted on an aiding and abetting theory the same limiting instruction as to derivative liability for "natural and probable consequences" that is invariably given when a similarly situated defendant is tried as a conspirator.[10]

[8] See, e.g., *United States* v. *Gooding* (1827) 25 U.S. (12 Wheat.) 460, 469 [6 L.Ed. 693, 696]; *Logan* v. *United States* (1892) 144 U.S. 263, 308-309 [36 L.Ed. 429, 445, 12 S.Ct. 617]; *Hyde* v. *United States* (1912) 225 U.S. 347, 359 [56 L.Ed. 1114, 1123, 32 S.Ct. 793]; *Nye & Nissen* v. *United States* (1949) 336 U.S. 613, 618 [93 L.Ed. 919, 924-925, 69 S.Ct. 766]; *People* v. *Keefer* (1884) 65 Cal. 232, 233 [3 P. 818]; *People* v. *Harper* (1945) 25 Cal.2d 862, 870 [156 P.2d 249].

[9] In *Durham,* the defendant was convicted of first degree murder as an aider and abettor after his companion shot and killed a police officer who had stopped the two men for a traffic violation. The defendant argued that although he and his friend had previously been engaged in a conspiracy to rob there was neither evidence of a conspiracy to resist arrest nor evidence that he aided and abetted the shooting. (*Id.*, at pp. 179-180.) The court rejected the argument, observing that the "prosecution's theory of the case cannot be split into such fragments. . . . It is true that in presenting its case the prosecution had recourse to the principles of conspiracy. However, this thesis, far from seeking to establish a basis of criminal liability separate and apart from aiding and abetting, was pursued for the purpose of demonstrating Durham's intimate involvement in the continuing criminal enterprise which culminated in the shooting of [the officer]." (70 Cal.2d at p. 180, fn. omitted.) Durham was properly convicted as an aider and abettor because the evidence adduced at trial supported the inference that the prior robberies were part of a criminal spree which encompassed forcibly resisting arrest.

[10] The present case differs from *People* v. *Ross* (1979) 92 Cal.App.3d 391 [154 Cal.Rptr. 783], in which the court determined that it was proper to refuse requested conspiracy instructions. In *Ross,* the defendant was convicted of murder, robbery, burglary and arson. The defendant confessed that he and a codefendant planned a burglary and robbery and tied up the victim, but claimed that he did not participate in the subsequent beating and burning of the victim, protested when his cohort prepared to set fire the victim, and left before the burning because he wanted no part in the murder. (*Id.*, at pp. 398-399.) At trial, the defendant sought conspiracy instructions in order to show termination of and withdrawal from the completed agreement to commit burglary and robbery before the murder. The appellate court found that it was not necessary to give conspiracy instructions because neither the prosecution nor the defense had relied upon evidence suggesting a conspiracy theory and the only termination and withdrawal shown by the evidence was covered by the aiding and abetting instructions which were given. (*Id.*, at p. 404.) In the instant case, by contrast, there is credible evidence that appellant and Bluitt agreed in advance on a particular course of criminal conduct, the facts giving rise to the agreement were heavily relied on by the defense, and the theory upon which the defendant sought instructions limiting derivative liability—to show that an act

*People* v. *Villa, supra*, 156 Cal.App.2d 128, is not, as the majority contends, inconsistent with this proposition. The defendant in that case sexually assaulted the victim in a car. When his cohorts unexpectedly later showed up he left the car and stood by while they committed similar offenses. Thereafter the defendant reentered the car and drove it away while his two friends beat the victim and forced her to orally copulate them in the backseat. The defendant knew what they were doing "but did nothing about it." (*Id.*, at p. 132.) The defendants were jointly tried and all were convicted of some of the offenses. Villa was acquitted of rape and of conspiracy, but found guilty of forced oral copulation and of robbery, though he did not directly participate in the commission of either of those crimes. The Court of Appeal upheld these convictions, reasoning that "although it acquitted appellant of the rape and conspiracy charges, [the jury] could find that appellant forced the complaining witness in his car, beat her and forced her to submit. It could also find that he turned his victim over to his friends for their pleasure, and then drove the get-away car to the destinations desired by his confederates." (*Id.*, at p. 136.) Thus, the statement in *Villa* that "[o]ne may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it" (*Id.*, at p. 134) simply reflects the fact that the element of agreement distinguishes conspiracy from aiding and abetting. The acquittal of conspiracy was not inconsistent with conviction as an aider and abettor because the jury presumably found that the defendant and his confederates did not plan their criminal enterprise or agree to assist one another.[11] In the present case, unlike *Villa,* it is conceded that the principals agreed to jointly commit and planned a criminal offense: the murder of Chuckie. Nothing in *Villa* indicates that a jury may convict a defendant of conspiracy or as an aider and abettor if it finds that the perpetrator's intentional act exceeded the purpose of an agreed upon plan and that the charged offense did not further that plan. The majority's use of *Villa* to show that the jury in an aiding and abetting case is "bound to consider relevant evidence of an uncharged conspiracy"—which is certainly correct—undermines rather than supports the majority's erroneous conclusion that it is unnecessary to instruct the jury with respect to the legal significance of the evidence of the conspiracy it is bound to consider.

By failing to require instructions on this issue the majority has, among other things, provided district attorneys a strong incentive to prosecute

outside the scope and not in furtherance of the act intended to be aided and abetted—was not covered by any of the instructions given.

[11] For those unpersuaded that the verdicts were not inconsistent, the court alternatively pointed out that "each count charging a separate and distinct offense must stand or fall on its own merits. The disposition of one count has no effect or bearing upon the other counts. *This is so even though the respective verdicts in the various counts may be logically inconsistent.* [Citations.]" (*Id.*, at p. 133, italics added.)

cases clearly involving conspiracy solely on an aiding and abetting theory, and in this manner deprive a defendant of a limitation on derivative liability that is logically justified. This is not a conventional charging decision, goes far beyond permissible prosecutorial discretion to investigate or prosecute, and finds no support in the cases relied upon in this connection by the majority. The cases show that conspiracy instructions relevant to the prosecution theory of complicity are commonly given in aiding and abetting cases when requested by a district attorney; there is no reason a defendant should be prevented from doing the same thing where, as here, such an instruction is necessary to instruct the jury on the defense theory of the case. The majority confers upon prosecutors a power to determine the giving of instructions heretofore reserved to the court; a power prosecutors have never claimed but will now surely assert.

3.

The most astonishing aspect of the majority opinion is the cavalier manner in which it ignores the law relevant to the duty to instruct, which should be central to our analysis.[12] Stating that we must "consider[ ] the evidence in the light most favorable to the verdict" (maj. opn., p. 1054) my colleagues focus upon the irrelevant questions whether the jury conceivably could have convicted appellant if it had received the instruction in issue or whether it might be possible to convict him on grounds unrelated to that instruction, thereby excusing the failure to give it to the jury.

The majority first endeavors to show that the defense theory of the case is not dispositive. According to the majority, "the hardheaded and *presumably* erratic and uncontrollable nature of his co-assassin was previously known to appellant." (Maj. opn., p. 1055, italics added.) Because he knew Bluitt was uncontrollable, the majority concludes that the killing of Barfield was reasonably foreseeable even though it was "different from, and not in furtherance of, the criminal act first contemplated." (Maj. opn., p. 1054.)

The fact that the jury could have found appellant guilty as an aider and abettor by rejecting the defense theory of the case—believing appellant knew Bluitt was unpredictable and should therefore have foreseen an

---

[12] Earlier in its opinion the majority states that "taken together the instructions given by the lower court . . . contain language approved by the Supreme Court in *People* v. *Beeman, supra,* 35 Cal.3d 547, and *People* v. *Croy, supra,* 41 Cal.3d 1, and the change of language suggested by *People* v. *Hammond* (1986) 181 Cal.App.3d 463, 468-469 [226 Cal.Rptr. 475]." (Maj. opn., p. 1048.) This statement is beside the point, as appellant is not challenging any instructions that were given in this case. The Supreme Court has never excused the failure to give the instruction appellant claims were erroneously refused. Moreover, the language and logic of numerous Supreme Court opinions, commencing with *People* v. *Kauffman, supra,* 152 Cal. 331, 334, indicate it was error to refuse such an instruction.

intentional act—would not excuse the failure to instruct on the defense theory even if there were evidence to support this alternative view of the facts, *as there is not,* or if the district attorney had urged it on the jury, *as he never did.* The only ostensible "evidence" of what the majority describes as Bluitt's "presumably erratic and uncontrollable nature" is a single passing reference to Bluitt as "hardheaded" in one of appellant's several lengthy statements to the police. The majority seizes on the single casual use of this adjective, claiming that "[b]y common lay understanding, one who is hardheaded may be foreseeably and irrationally difficult to dissuade or control once embarked on a criminal enterprise, whether under the goad of fear of the director of that enterprise or fear of the intended victim or for other reasons." (Maj. opn., p. 1054.) This assertion of the "common lay understanding" of the word "hardheaded" is truly bizarre. According to the dictionary definition, a "hardheaded" person is not irrational or erratic, but "stubborn, willful, . . . *not moved by sentiment or impulse;* having no illusions, *practical, sober, realistic.* " (Webster's Third Internat. Dict. (Unabridged) p. 1033, italics added.)

Because of the absence of any evidence appellant knew Bluitt was "erratic" or "uncontrollable," and because the prosecution theory of aiding and abetting did not rest on any such idea, the People never at trial or on this appeal even suggested appellant should have foreseen Bluitt would intentionally kill someone other than the agreed upon victim because he knew Bluitt was unpredictable or irrational. Thus the majority excuses the failure to give a legally correct instruction directly related to a central defense theory that has some evidentiary support because it believes the jury might have convicted on an alternative basis never advanced by the district attorney which has no support in the record. This contrived analysis just does not wash.

As an alternative argument, the majority claims that the jury could have convicted appellant even if it had been instructed on the law pertaining to the defense. Thus the majority contends that "[Bluitt] *might* have been reasonably foreseen to have viewed appellant's recanting of Barfield's true identification as a loss of resolve, because of the police presence or for other reasons." (Maj. opn., p. 1055, italics added.) Still later the majority further speculates that "the jury *could* have concluded that Barfield's murder did further the parties' original agreement to kill Chuckie," because part of the criminal compact was to terrorize "The Man's" enemies. (Maj. opn., p. 1055, italics added.) These attempts to show either that the evidence in support of the defense theory was too weak to justify the requested instruction or that the jury could have convicted appellant even if the instruction had been given are entirely inappropriate. *It is the responsibility of a properly instructed jury, not this court, to weigh the evidence.* The issue in this case is

not whether appellant can be found guilty, which is undeniable, but whether the jury was properly instructed.

The majority's labored analyses make a mockery of the legal principles bearing upon a trial court's responsibility to adequately instruct, which are well settled. The duty to instruct on the general principles of law relevant to issues raised by the evidence encompasses the "the duty to give instructions, *sua sponte,* on particular defenses and their relevance to the charged offense . . . *if it appears that the defendant is relying on such a defense,* or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], italics added.) The Supreme Court has repeatedly found it is " ' "*elementary* that the court should instruct the jury upon every material question upon which there is *any evidence deserving of any consideration whatever." ' "* (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1], quoting *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281], quoting *People* v. *Burns* (1948) 88 Cal.App.2d 867, 871 [200 P.2d 134], italics in original.) " '*Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.' "* (*Flannel, supra,* at p. 685, quoting *People* v. *Wilson* (1967) 66 Cal.2d 749, 763 [59 Cal.Rptr. 156, 427 P.2d 820], italics added.)

Applying the foregoing principles, it could not be more clear that the trial court erred in refusing the instruction at issue in this case.

The trial court had two obvious means of presenting the law relevant to the defense theory. First, CALJIC No. 6.15, the standard conspiracy instruction relating to this theory, could have been modified to apply to an aider an abettor.[13] Alternatively, the standard aiding and abetting instructions could have been modified to clarify that an act which is intentionally committed by the perpetrator, different from and not in furtherance of the one knowingly and intentionally encouraged, is not a natural and probable consequence of the intended act. By not giving such an instruction, the trial court deprived appellant of his right to have his theory of the case presented to the jury. (*People* v. *Carmen, supra,* 36 Cal.2d at p. 773.)

As earlier noted, the defense theory was not adequately covered by the giving of CALJIC No. 3.02 because, unlike CALJIC No. 6.15, that instruction does not relate "natural and probable consequences" to the defense

---

[13] For example: "No reasonably unforeseeable act or declaration of a perpetrator that is an independent product of his own mind and is outside the offense which the defendant knowingly and intentionally aided and abetted and not a furtherance of that offense is binding upon the defendant, and the defendant is not criminally responsible for any such act."

claim that Bluitt's intentional act was a product only of his mind that did not further the different criminal offense planned.[14] Nor was the defense theory covered by the modified version of CALJIC No. 3.03 that was given. This instruction deals with the actions necessary for one who has aided and abetted commission of a crime to end his responsibility for the crime by withdrawal from the criminal enterprise.[15] Appellant's theory was different: He sought to convince the jury that he could not be held liable as an aider and abettor because it was not reasonably foreseeable that his cohort would intentionally act outside the scope of the criminal compact in a manner that did not further the purpose of that compact. That appellant allegedly attempted to stop Bluitt from firing at Hosea is not essential to this defense theory, even though it might be seen as strengthening the argument that he should not be held responsible for Bluitt's act. If the jury agreed that Bluitt independently and intentionally acted outside the plan appellant aided and abetted and not in furtherance of that plan, appellant could not be held liable even if he had done nothing to affirmatively stop Bluitt.[16] Stated differently, the withdrawal instruction relates to the conduct of the putative aider and abettor; the instruction at issue in this case relates to the conduct of the perpetrator, i.e, whether it was reasonably foreseeable.

The remaining question is whether the erroneous failure to instruct requires that the conviction be reversed. As indicated, I agree that a properly instructed jury could find appellant guilty. For example, as my colleagues point out, the jury could have found that the criminal design was calculated to intimidate enemies of The Man and that the killing of Barfield furthered that purpose. The problem, however, is that under the instructions given the jury could have convicted appellant as an aider and abettor even if, accepting appellant's version of the facts, it believed Bluitt's independent intentional act was outside the common design and did not further that design.

"[A] failure to instruct where there is a duty to do so can be cured only if it is shown that 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given,

---

[14] The majority's contrary conclusion (maj. opn., p. 1055) in effect means that it can never be error to refuse CALJIC No. 6.15 in a conspiracy case if, as is invariably the case, CALJIC No. 6.11 is given.

[15] The modified version of CALJIC No. 3.03 given in this case was as follows: "One who has aided and abetted the commission of a crime with knowledge of the unlawful purpose of the perpetrator of a crime, may end his responsibility for the crime by notifying the other party or parties of whom he has knowledge of his intention to withdraw from the commission of the crime and by doing everything *reasonable under the circumstances* in his power to prevent its commission." (Italics added.)

[16] The situation would obviously be different if there were evidence that appellant shared the new criminal object or knowingly intended to assist Bluitt's new plan.

instructions.' " (*People* v. *Stewart* (1976) 16 Cal.3d 133, 141 [127 Cal.Rptr. 117, 544 P.2d 1317], quoting *People* v. *Sedeno, supra,* 10 Cal.3d at p. 721.) Here, the jury was simply not adequately informed of an important legal principle applicable to an essential element of derivative liability as an aider and abettor: the element of foreseeability. Because the jury found he did not personally use a firearm or inflict great bodily injury, it is clear appellant was convicted as an aider and abettor, not as the perpetrator. Considering that he voluntarily went to the police knowing he was not under suspicion, openly cooperated with the investigation and gave the police two taped statements consistent with the defense theory advanced at trial, the jury might not have returned a guilty verdict if it had received the instructions erroneously refused. In any event, the Supreme Court has said that "instructions or omissions which deny a defendant his right to have the jury decide each element of a charged offense are necessarily reversible error." (*People* v. *Garcia* (1984) 36 Cal.3d 539, 550 [205 Cal.Rptr. 265, 684 P.2d 826].) Accordingly I would reverse the judgment.

A petition for a rehearing was denied January 10, 1990, and appellant's petition for review by the Supreme Court was denied April 4, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.