Filed 10/7/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LESLIE BRIGHAM,<br><br>on Habeas Corpus. | A144572<br><br>(Alameda County<br>Super. Ct. No. 86632) |

BY THE COURT:

It is ordered that the opinion filed herein on September 14, 2016, be modified as follows:

On page 5, section II. of the Discussion, the first two sentences are deleted and replaced with the following:

"As we have said, petitioner was 'convicted of first degree murder as an aider and abettor.' (*Brigham, supra,* 216 Cal.App.3d at p. 1042.)"

Following the *Brigham* cite above, a footnote is added with the following text:

"In its return to the petition for writ of habeas corpus, respondent 'assumes that Norbert Bluitt, and not petitioner, was the direct perpetrator,' for purposes of determining the existence of error."

On page 14, in the last paragraph beginning with "We cannot conclude", the second sentence beginning with "As no felony murder theory" is deleted and replaced with the following:

"No felony murder theory was offered at trial. The jury rejected the personal use and infliction of great bodily injury enhancements."

1

The petition for rehearing is denied.  This modification does not change the judgment.


Dated:_____                    _____
                                               Richman, Acting P.J.

A144572, *In re Leslie Brigham on Habeas Corpus*

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LESLIE BRIGHAM,<br><br>        on Habeas Corpus. | A144572<br><br>(Alameda County<br>Super. Ct. No. 86632) |

Petitioner was convicted in 1987 of first degree murder as an aider and abettor. In 2014, the California Supreme Court held that an aider and abettor may be convicted of first degree premeditated murder only under direct aiding and abetting principles, not under the natural and probable consequences doctrine. (*People v. Chiu* (2014) 59 Cal.4th 155, 158-159 (*Chiu*).) Petitioner filed this writ, claiming the record does not establish beyond a reasonable doubt that the jury convicted him of first degree murder on a legally authorized ground. He seeks reversal of his conviction and remand for a new trial or reduction of the conviction to second degree murder. We will grant the petition.

STATEMENT OF THE CASE

As described in our opinion on petitioner's appeal from his 1987 conviction (*People v. Brigham* (1989) 216 Cal.App.3d 1039, 1042 (*Brigham*)), petitioner was charged by information with the first degree murder of Hosea Barfield (Pen. Code, § 187[1]), with allegations that he personally used a firearm and inflicted great bodily injury on the victim, and that he had been convicted of a serious felony for which he received probation in New Mexico. (Pen. Code, §§ 12022.5; 667.) A jury convicted petitioner of first degree murder, but found that he did not personally use a firearm or

---

[1] Further statutory references will be to the Penal Code.

1

inflict great bodily injury. Petitioner waived jury trial on the enhancement allegation of prior serious felony conviction, and the court found it true. Petitioner was sentenced to a prison term of 25 years to life on the murder conviction, with a consecutive five-year term for the prior. (*Brigham, supra,* 216 Cal.App.3d at p. 1042.)

On appeal, a different panel of this court struck the five-year enhancement, affirmed the judgment (over the dissent of Presiding Justice Kline), and denied a contemporaneous petition for writ of habeas corpus. (*Brigham, supra,* 216 Cal.App.3d at p. 1057.)

The present petition was filed on March 19, 2015. After considering respondent's informal opposition to the petition and petitioner's reply thereto, we issued an order to show cause why the requested relief should not be granted. Respondent filed its return on November 17, 2015, and petitioner filed his traverse on December 11, 2015.

STATEMENT OF FACTS[2]

On the evening of January 21, 1986, Barbara Dawson and her cousin Catherine Barfield experienced car trouble while parked on East 14th Street, near 61st Avenue. Mrs. Barfield, who lived nearby in the 65th Village, telephoned her husband and 14-year-old son Hosea Barfield (Barfield), who both agreed to come help. As the two women walked back to the car, they saw Barfield across the street walking along East 14th to meet them. (*Brigham, supra,* 216 Cal.App.3d at p. 1042.)

Upon reaching the car, while starting to unlock the door, Ms. Dawson saw a man wearing dark clothes and a ski mask pulled down over his face come around the corner. The man lifted a rifle-type gun and shot it several times. Ms. Dawson ducked down, then flagged a passing car. She did not see the man when she got up. (*Brigham, supra,* 216 Cal.App.3d at p. 1043.)

As Ms. Dawson approached the driver's side of the car, Mrs. Barfield went to join her son at the passenger side. Noticing a clicking noise, she turned and saw a man

[2] The Statement of Facts is taken from our opinion on the prior appeal. (*Brigham, supra,* 216 Cal.App.3d 1039.)

2

standing by the corner barbershop with a dark ski mask covering his face and a rifle-type gun in his hands. Barfield told her to run, and as she did so, she saw the gun fire. Mrs. Barfield called the police from a store, then returned to find her son dead on the sidewalk. (*Brigham, supra,* 216 Cal.App.3d at p. 1043.)

The driver of the car Ms. Dawson flagged down testified that he heard shots as he was driving down East 14th, approaching 61st. He looked to his left and saw a man crouched down and running. The man appeared to be wearing a drab-colored army jacket with a fur collar; the driver could not see the man's face or hands. (*Brigham, supra,* 216 Cal.App.3d at p. 1043.)

A pathologist testified that Barfield had at least three gun shot wounds to his neck, back, arm, and chest, and extensive internal injuries in his chest and brain. The police recovered three spent .223 caliber casings at the scene, which a ballistics expert said could have been fired by either an AR-15 or an HK-93. In his opinion, however, the bullets had not been fired from an HK-93. (*Brigham, supra,* 216 Cal.App.3d at p. 1043.)

Nearly nine months after the murder, when the police investigation had reached a dead end, petitioner approached an Oakland police officer and asked to talk to a homicide investigator about a " 'mistaken identity murder' " on East 14th Street. After a voluntary preliminary interview, petitioner was admonished about his rights and gave two taped statements. Petitioner related that on the night of the murder, he and another man, Norbert Bluitt (Bluitt), were ordered by " 'The Man' " (a person petitioner refused to identify) to kill "Chuckie," whom " 'The Man' " had held a grudge against for some time and petitioner considered an enemy of the group. Petitioner thought the group Chuckie was part of was " 'out to kill me.' " (*Brigham, supra,* 216 Cal.App.3d at pp. 1043-1044.)

" 'The Man' " arranged for automatic weapons to be delivered to petitioner and Bluitt; petitioner said his was an "HK-9," Bluitt had a similar gun and Dual Moore had a handgun. A ballistics expert testified that petitioner must have been referring to an HK-93. (*Brigham, supra,* 216 Cal.App.3d at p. 1044.)

Petitioner, Bluitt and Moore set out to find Chuckie, with Moore driving. Petitioner said that he was wearing dark clothes and a rolled-up ski mask, and Bluitt was

3

wearing a baseball cap marked with an " 'N' " pulled low over his face. Petitioner, an experienced hit man, stated that the only time he would put a ski mask " 'on my face' " was " 'when I'm tryin' ta hit, kill somebody.' " Petitioner had " 'worked' " with Bluitt before and knew Bluitt was " 'just hardheaded.' " (*Brigham, supra,* 216 Cal.App.3d at p. 1044.)

The hit men arrived at the 65th Village, where Chuckie was supposed to be, parked, and walked " 'in the back way' " to a porch where a group of men was gathered. The group scattered. Following one of the departing men, petitioner and his companions ran back to their car and drove toward East 14th on 64th, by a place known as "Plucky's," where they saw " 'a young guy.' " (*Brigham, supra,* 216 Cal.App.3d at p. 1044.) Seeing Barfield from the car, petitioner said it was Chuckie and Bluitt said, " ' ["]we're gonna get him.["] ' " As they got closer, petitioner said, " 'man, that is not Chuckie, man.' " Bluitt said, " 'we're gonna get him' " and directed the driver to make a right turn and stop. Petitioner and Bluitt both got out of the car with their weapons. Petitioner went, with his weapon, to the street corner near where the shooting occurred, saw an officer in a police car, then returned his gun to the car and told Bluitt, " '[P]olice right there, man. Don't do it. It ain't cool. That's not the dude, man. Come on.' " Bluitt said, " '["M]an, fuck dat. We's gonna waste it up. We's gonna let dese niggers know we serious.["]' " Petitioner tried to grab Bluitt's arm, but Bluitt fired more than twice, hitting Barfield in the face. (*Brigham*, *supra*, 216 Cal.App.3d at pp. 1044-1045.)

At the end of the police interview, petitioner identified photographs of Bluitt, Moore and the AR-15 rifle Bluitt carried. (*Brigham, supra,* 216 Cal.App.3d at p. 1045.) Ms. Dawson had identified the AR-15 military rifle as being most like the gun she saw in the hands of the shooter, choosing it over an HK-93 assault rifle. (*Brigham, supra,* 216 Cal.App.3d at p. 1043.)

The investigating officer testified that Moore told him Bluitt was wearing a dark gray hood. Both Ms. Dawson and Mrs. Barfield testified that the killer was not wearing a baseball cap. (*Brigham, supra,* 216 Cal.App.3d at p. 1044.)

DISCUSSION

## I.

Petitioner has filed this petition for writ of habeas corpus without seeking relief from the trial court, and respondent has raised no objection to this court exercising original jurisdiction. " 'It has long been the law in California that, while a Court of Appeal may have original jurisdiction in a habeas corpus proceeding, it has the discretion to deny a petition without prejudice if it has not been first presented to the trial court.' (*In re Kler* (2010) 188 Cal.App.4th 1399, 1403.) ' "Generally speaking, habeas corpus proceedings involving a factual situation should be tried in superior court rather than in an appellate court, except where only questions of law are involved." . . .' (*In re of Hillery* (1962) 202 Cal.App.2d 293, 294, quoting 24 Cal.Jur.2d, Habeas Corpus, § 68, pp. 524-525; *In re Davis* (1979) 25 Cal.3d 384, 389 [exercising original jurisdiction where the petitions raised issues of law and there were no material factual issues].)" (*In re Johnson* (2016) 246 Cal.App.4th 1396, 1402 (*Johnson*).) Resolution of the issue presented here does not require further factual determinations but rather analysis of legal argument and assessment of prejudice, both issues appropriate for an appellate court. Accordingly, we elect to exercise our jurisdiction to resolve the writ petition.

## II.

As we have said, petitioner was convicted of first degree murder as an aider and abettor. The jury's rejection of the charged enhancements for personal use of a firearm and personal infliction of great bodily injury make this clear. "There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted. " ' (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 . . . .)" (*Chiu, supra,* 59 Cal.4th at p. 158.) "A nontarget offense is a 'natural and probable consequence' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. ([*People v.*] *Medina*[ (2009)] 46 Cal.4th [913,] 920.) The

inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense.  (*Ibid.*)  Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." '  (*Ibid.*)  Reasonable foreseeability 'is a factual issue to be resolved by the jury.'  (*Id.* at p. 920.)"  (*Chiu, supra,* 59 Cal.4th at pp. 161-162.)

"The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion.'  (*People v. Luparello* (1986) 187 Cal.App.3d 410, 439, italics added; see [*People v.*] *Prettyman*[ (1996)] 14 Cal.4th [248,] 260, quoting *Luparello.*)"  (*Chiu, supra,* 59 Cal.4th at pp. 164-165.)  "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing."  (*Chiu, supra,* 59 Cal.4th at p. 165.)

*Chiu* considered these principles in the context of a case where the target offense of assault or disturbing the peace resulted in a murder.  (*Chiu, supra,* 59 Cal.4th at p. 160.)  For policy reasons, the court held that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine."  (*Id.* at pp. 158-159.)  The court explained:  "A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder."  (*Id.*, at p. 165.)  "However, this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder.  First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty.  (*People v. Knoller*[ (2007)] 41 Cal.4th [139,] 151.)  That mental

6

state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) . . . [T]he connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above-stated public policy concern of deterrence." (*Chiu, supra,* 59 Cal.4th at p. 166.)

*Chiu* further explained that aiders and abettors "may still be convicted of first degree premeditated murder based on direct aiding and abetting principles[,]" under which "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu, supra,* 59 Cal.4th at pp. 166-167.) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Id.* at p. 167.)

Respondent maintains that *Chiu* is inapplicable where, as here, the target offense is itself premeditated murder.[3] The *Chui* opinion did not suggest any exceptions to the rule it stated. In respondent's view, however, there is no unfairness in holding petitioner

---

[3] Respondent has not taken issue with petitioner's argument that *Chiu* is retroactive. "The *Chiu* decision set forth a new rule of substantive law by altering the range of conduct for which a defendant may be tried and convicted of first degree murder." (*In re Lopez* (2016) 246 Cal.App.4th 350, 358.) Like other cases making similar changes in substantive criminal law (*In re Lucero* (2011) 200 Cal.App.4th 38, 45-46 (*Lucero*) [*People v. Chun* (2009) 45 Cal.4th 1172 (*Chun*) retroactive]; *In re Hansen* (2014) 227 Cal.App.4th 906, 918-920 (*Hansen*) [*Chun* retroactive]), *Chiu* has been held to apply retroactively. (*In re Lopez, supra,* 246 Cal.App.4th at pp. 357-360; see *Johnson, supra,* 246 Cal.App.4th at p. 1404, fn. 2.)

liable for the premeditated murder of Barfield because petitioner intended to facilitate a premeditated murder, albeit the murder of Chuckie rather than Barfield. Respondent argues that where the target offense is premeditated murder and the perpetrator commits that offense against a different victim, there is no "disjunction" between the aider and abettor's intent to commit the target offense and the perpetrator's intent to commit the non-target offense. In effect, respondent maintains that petitioner acted with the intent of a direct aider and abettor, albeit with a different intended victim, and limiting the prosecution to second degree murder in this situation would confer a windfall upon petitioner.

Respondent's argument evokes the doctrine of transferred intent, under which "a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had ' "the fatal blow reached the person for whom intended.' " (*People v. Bland* (2002) 28 Cal.4th 313, 321, quoting *People v. Suesser* (1904) 142 Cal. 354, 366.) Indeed, respondent argues that in the present case, the prosecutor used the natural and probable consequences theory "as a proxy for the transferred intent doctrine." But, as respondent points out, the jury was also instructed on transferred intent. This theory would have established petitioner's liability as a direct aider and abettor without resort to consideration of natural and probable consequences. Respondent does not explain why the prosecutor would have needed to use the natural and probable consequences doctrine to "substitute for" or "supplement" the transferred intent theory.

If the jury rejected petitioner's defense, the transferred intent theory would have easily directed it to find petitioner guilty of the premeditated murder of Barfield.[4] But if the jury believed that petitioner did not intend to kill or assist in the killing of someone other than Chuckie, told Bluitt the person they were following was not Chuckie and tried to stop Bluitt from shooting, and that Bluitt intentionally and deliberately shot Barfield

[4] Of course, the jury also could have found petitioner guilty as a direct aider and abettor without reliance on the transferred intent theory if it believed petitioner shared Bluitt's intent to kill Barfield knowing Barfield was not Chuckie.

8

anyway, the jury instructions would not have permitted reliance on the theory of transferred intent, because this theory applies when the perpetrator intends to kill one victim and *unintentionally* kills another. CALJIC No. 8.65 directs the jury, "When one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed." To the same effect, CALCRIM No. 562 instructs, "If the defendant intended to kill one person, but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed." The natural and probable consequences theory does not expressly refer to concepts such as mistake or inadvertence; it asks whether a reasonable person in the aider and abettor's position would have known that the perpetrator's premeditated murder of a different victim was a natural and probable consequence of the originally premeditated murder. Thus the jury could have relied upon this doctrine to find petitioner guilty if it believed that a reasonable person, knowing what petitioner knew about the situation and about Bluitt, would or should have known it was reasonably foreseeable that Bluitt would commit a premeditated murder of a different victim. Natural and probable consequences was not used by the prosecutor as a proxy for transferred intent; it was an alternate theory offered to enable the jury to find petitioner guilty even if it believed he did not intend to aid and abet the *intentional* murder Bluitt actually committed.

Respondent's argument that *Chiu* does not apply where the target crime is premeditated murder, despite some superficial appeal, is not persuasive. The appeal lies in the fact that, unlike the defendant in *Chiu*, petitioner intended to facilitate a premeditated murder, not some lesser offense. But, if the jury accepted petitioner's defense, petitioner intended only to facilitate one specific premeditated murder, the murder of Chuckie. Respondent's argument assumes that the mens rea of a person who knowingly acts with the intention of assisting in the premeditated murder of a specific victim necessarily transfers to an intention to assist in killing a completely unrelated victim the perpetrator independently decides to kill instead.

9

The *Chiu* decision was based upon the "uniquely subjective and personal" mental state required for conviction of first degree premeditated murder—the "willfulness, premeditation, and deliberation" that trigger the harsher penalty for first degree murder. (*Chui, supra,* 59 Cal.4th at p. 166.) It was this subjective element of deliberation and careful weighing of considerations that led *Chui* to conclude that an aider and abettor who did not personally have the mens rea required for first degree murder could not be held liable under the natural and probable consequences doctrine. (*Id.* at pp. 166-167.) If his defense was believed, petitioner did not intend to kill or assist Bluitt in killing anyone other than Chuckie, and once he realized Chuckie was not the person in their sights, he tried to stop Bluitt from shooting. As we have said, if Bluitt intended to kill Chuckie and thought he was doing so, but accidentally killed Barfield, petitioner would have been liable as a *direct* aider and abettor under the doctrine of transferred intent; his aiding and abetting of the intended murder in essence assumed the risk that the perpetrator would mistakenly kill the wrong victim. But Bluitt's independent, intentional, deliberate and premeditated decision to kill a different victim would reflect a personal and subjective state of mind that was insufficiently connected to petitioner's culpability for aiding and abetting the (intended) murder of Chuckie to justify holding petitioner liable for Bluitt's premeditated independent act.

As applied to this case, *Chui* directs that petitioner could be found guilty of the first degree premeditated murder of Barfield as a direct aider and abettor, only if he "aided or encouraged the commission of the murder [of Barfield] with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu, supra,* 59 Cal.4th at p. 167.) If he did not intend to commit, encourage or facilitate the premeditated murder of Barfield, he could *not* be found guilty of that offense on the theory that the murder of Barfield was a natural and probable consequence of the crime he did intent to commit, encourage or facilitate (the premeditated murder of Chuckie). As we have said, however, the jury in the present case was instructed on both direct aiding and abetting and the natural and probable consequences theory.

10

Assessing whether the error in *Chiu* was harmless, the court explained, "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129; *People v. Green* (1980) 27 Cal.3d 1, 69-71.) Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu, supra,* 59 Cal.4th at p. 167.)

Respondent argues that this test should not be employed on collateral review. Instead, respondent argues that petitioner is not entitled to relief on this petition because he cannot show he was not guilty of first degree murder as a matter of law. Respondent argues that *Chiu* narrowed the scope of substantive liability for the crime but did not redefine it, and that under these circumstances, "petitioner is only ' "entitled to habeas corpus if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct. [Citations.]" . . .' (*People v. Mutch* (1971) 4 Cal.3d 389, 396 (*Mutch* ), quoting *In re Zerbe* (1964) 60 Cal.2d 666, 667-668.)" (*Johnson, supra,* 246 Cal.App.4th at p. 1404.) In other words, "a petitioner must demonstrate 'as a matter of law' that his conduct did not violate the statute of conviction. (*In re Earley* (1975) 14 Cal.3d 122, 125 [(*Earley*)], superseded by statute on other grounds in *People v. Vines* (2011) 51 Cal.4th 830, 869.)" (*Johnson, supra,* 246 Cal.App.4th at p. 1404.) Petitioner cannot satisfy this test, respondent urges, because he could have been found guilty of first degree murder under the doctrine of transferred intent.

Respondent's position on the assessment of *Chiu* error in the habeas context was rejected in *Johnson, supra,* 246 Cal.App.4th at pp. 1406-1407. As *Johnson* explained, cases involving changes in law analogous to *Chiu* have employed the *Chapman*[5] beyond a reasonable doubt standard on habeas review. In *Chun, supra,* 45 Cal.4th 1172, the

---

[5] *Chapman v. California* (1967) 386 U.S. 18.

11

Supreme Court "reconsidered the scope of the second degree felony-murder rule and expressly overturned its previous holding that shooting at an occupied vehicle could form the basis for such a conviction." (*Johnson, supra,* 246 Cal.App.4th at p. 1405.) This change was the basis for a habeas petition in *Lucero, supra,* 200 Cal.App.4th 38, in which the jury instructions permitted a murder conviction to be predicated on such a shooting. After concluding that *Chun* applied, the *Lucero* court found the error "harmless beyond a reasonable doubt" (*Lucero, supra,* 200 Cal.App.4th at p. 52), as " '[n]o juror who correctly followed the instructions could arrive at a verdict of attempted murder without addressing the question of malice aforethought and resolving it against Lucero. Hence, this is a case where "other aspects of the verdict . . . leave no reasonable doubt that the jury made the findings necessary for conscious-disregard-for-life malice. . . ." (*Chun, supra,* 45 Cal.45th [Cal.4th] at p. 1205.)' (*Lucero,* at p. 51.)" (*Johnson, supra,* 246 Cal.App.4th at p. 1405.) *Hansen, supra,* 227 Cal.App.4th 906, 922-928, applied the beyond a reasonable doubt standard for harmless error in the long-final case that was expressly overruled by *Chun*, finding prejudice because nothing in the jury's verdict showed it relied upon the legally valid theory rather than the invalid felony murder theory, or made the findings necessary to support the valid theory.

*Johnson* found the reasoning of *Lucero* and *Hansen* more applicable to the *Chiu* situation than that of *Earley and Mutch*, the same cases respondent relies upon in the present case. *Johnson* explained that "*Chun* and *Chiu* represent changes in the law, not merely a narrowing of the court's interpretation of the law as advanced by respondent," and the error does not require the court " ' "to review determinations of fact made upon conflicting evidence after a fair trial" ' "[6] but rather "goes to the reliability of the

---

[6] This quote in *Johnson* is from the dissenting opinion in *Neal v. State of California* (1960) 55 Cal.2d 11, 23 (disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331), which disagreed with the majority's view that the case was appropriate for habeas corpus review. Contrary to the majority's view of the case as involving a question of law on undisputed facts, dissenting Justice Schauer viewed the case as presenting a question of sufficiency of the evidence and stated, "The subject use of habeas corpus is squarely contrary to the following rules: '[H]abeas corpus may not be

conviction and the question of guilt or innocence of the crime for which petitioner was convicted—first degree premeditated murder. As the Supreme Court in *Chiu* noted, there is a significant difference between first degree premeditated murder and second degree murder—a sentence of 25 years to life versus 15 years to life." (*Johnson, supra,* 246 Cal.App.4th at pp. 1406-1407.)

By contrast, *Mutch* and *Earley* "only addressed insufficiency of the evidence claims and the 'excess of jurisdiction' exception to the *Waltreus/Dixon* rules limiting relitigation of appellate claims on habeas."[7] (*Johnson, supra,* 246 Cal.App.4th at p. 1407, fn. omitted.) In *Mutch* and *Earley,* subsequent to the petitioners' convictions of kidnapping for the purpose of robbery under section 209, *People v. Daniels* (1969) 71 Cal.2d 1119, 1139, held—contrary to previous interpretations of the statute—that the asportation element of the offense intended by the Legislature is not satisfied by movements of the victim that are "merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Earley, supra,* 14 Cal.3d at pp. 126-127; *Mutch, supra,* 4 Cal.3d at p. 394.) Both cases applied the principle that " 'a defendant is entitled to habeas corpus if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct. [Citations.]' " (*Mutch, supra,* 4 Cal.3d at p. 396, quoting *In re Zerbe* (1964) 60 Cal.2d 666, 667-668; *Earley, supra,* 14 Cal.3d at p. 125.) In both, the question was whether the

---

used instead of an appeal to review determinations of fact made upon conflicting evidence after a fair trial. [Citations.] Likewise, the writ is not available to correct errors or irregularities relating to ascertainment of the facts when such errors could and should have been raised by appeal. [Citations.]' (*In re Dixon* (1953) 41 Cal.2d 756, 760.)"

[7] The referenced rules illustrate the principle that "[p]roper appellate procedure . . . demands that, absent strong justification, issues that could be raised on appeal must initially be so presented, and not on habeas corpus in the first instance." (*In re Harris* (1993) 5 Cal.4th 813, 829; *In re Waltreus* (1965) 62 Cal.2d 218, 225 [petitioner precluded from raising claim previously raised and rejected on appeal]; *In re Dixon, supra,* 41 Cal.2d at p. 759 [petitioner precluded from raising claim that was not raised on appeal but should have been]; *Johnson, supra,* 246 Cal.App.4th at p. 1407, fn. 4.)

evidence showed that as a matter of law the movement of the victim was incidental to the robbery and, therefore, the defendant's conduct did not violate section 209. (*Mutch, supra,* 4 Cal.3d at p. 396; *Earley, supra,* 14 Cal.3d at pp. 130-131.) If it did, relief via habeas corpus was appropriate to rectify the error of the court's act in "excess of its jurisdiction." (*Mutch, supra,* 4 Cal.3d at p. 396.)

Unlike the situation in *Mutch* and *Earley*, the issue here is not whether the facts support petitioner's conviction but whether the jury could have relied upon an invalid legal theory in convicting him. We agree with *Johnson* that "the scope of California habeas corpus review is not so limited as respondent suggests based on *Mutch* and *Earley*. Rather, the Supreme Court's *Chiu* opinion effected a significant change in the law of aiding and abetting, eliminating the natural and probable consequences doctrine as a basis for a conviction of first degree murder. There is no question that the arguments and jury instructions allowed the jury to base its murder finding on the now-discredited theory of natural and probable consequences; accordingly, as instructed by our Supreme Court, we now turn to the question of prejudice." (*Johnson, supra,* 246 Cal.App.4th at p. 1407.)

We cannot conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that petitioner directly aided and abetted the premeditated murder and not on the legally invalid natural and probable consequences doctrine. As no felony murder theory was offered at trial, and the jury's rejection of the personal use and infliction of great bodily injury enhancements demonstrates that petitioner was not convicted as the actual perpetrator, petitioner was necessarily convicted as an aider and abettor. The jury was instructed on the natural and probable consequences theory, and this theory was argued by the prosecution. This theory would have provided the route to conviction if the jury believed part or all of petitioner's defense, and that defense was not implausible. While a defendant's statements to the police might often be dismissed as self-serving, in this case petitioner was not a suspect attempting to dispel suspicion when he spoke with the police. As earlier indicated, petitioner voluntarily contacted the police almost nine months after the murder, after investigation of the murder had reached a dead

14

end, when there is no apparent reason it was in his interest to do so. (*Brigham, supra,* 216 Cal.App.3d at p. 1043.) There is simply no way to tell from the verdict whether the jury relied on the invalid natural and probable consequences theory or viewed appellant as a direct aider and abettor.

Petitioner's first degree murder conviction cannot stand. In this situation, *Chiu* found it appropriate to reverse the first degree murder conviction and allow the People to either accept a reduction to second degree murder or retry the greater offense under a direct aiding and abetting theory. We will grant the petition for writ of habeas corpus to provide the same relief. (*Johnson, supra,* 246 Cal.App.4th at pp. 1408-1409.)

## DISPOSITION

The petition for writ of habeas corpus is granted. The judgment of conviction is vacated and the matter is remanded to the superior court with directions to allow the People to accept a reduction of the conviction to second degree murder or elect to retry petitioner on first degree murder under a direct aiding and abetting theory. If the People do not elect to bring petitioner to trial within the time prescribed by law, the trial court shall enter judgment reflecting a conviction of second degree murder and shall resentence petitioner accordingly.

_____
Miller, J.

We concur:

_____
Richman, Acting P.J.

_____
Stewart, J.

15

Trial Court:  Superior Court of Alameda County


Trial Judge:  Hon. Joseph Carton


Attorneys for Petitioner                 Jonathan Soglin
                                         Paula Rudman
                                         Under appointments by the Court of Appeal

Attorneys for Respondent
                                         Kamala D. Harris
                                         Attorney General
                                         Gerald A. Engler
                                         Chief Assistant Attorney General
                                         Jeffrey M. Laurence
                                         Senior Assistant Attorney General
                                         Seth K. Schalit
                                         Supervising Deputy Attorney General
                                         Dorian Jung
                                         Deputy Attorney General

16