Filed 9/2/20  In re Sellers CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re TARELL LAMONT SELLERS[1]<br><br>on Habeas Corpus. | C088942<br><br>(Super. Ct. No. 01F09137) |

A jury found petitioner Tarell Lamont Sellers guilty of first degree murder in September 2003, and the trial court sentenced him to an indeterminate term of 50 years to life (plus six years in enhancements) by operation of a recidivist finding.  We affirmed the judgment on appeal, and the Supreme Court denied review.  (*People v. Sellers* (Dec. 13, 2004, C045032) [nonpub. opn.] (*Sellers*).)

Petitioner filed a request in 2017 for a writ of habeas corpus in the superior court.

---

[1]  At the time of his prior appeal, petitioner spelled his surname "Sellers."  In his filing, he now adopts "Seller" instead.  However, in order to avoid confusion for correctional records where he is still listed as "Sellers," we have amended the caption to conform with the former spelling.

1

(Super. Ct. No. 17HC00225.)  The trial court denied the writ in July 2017.  Petitioner then filed in this court, which denied the writ in September 2017.  (*In re Sellers* (Sept. 8, 2017, C085403).)  Finally, petitioner filed in the Supreme Court in October 2017, which asked the People to file an informal return.  In February 2019, the Supreme Court issued an order to show cause why petitioner is not entitled to relief under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) and *In re Martinez* (2017) 3 Cal.5th 1216 (*Martinez*), returnable before this court.  The People filed a formal return; petitioner's counsel filed a traverse; and the parties provided two rounds of supplemental briefing.  We shall grant the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

We draw the underlying facts from *Sellers, supra*, C045032.  The murder victim and his girlfriend were users of controlled substances, which they obtained from codefendant Anthony Taylor (among others).  The girlfriend worked as a prostitute to support their habit.  The two used Taylor as a supplier only as a last resort, because the latter treated the victim badly and the victim feared him.  Taylor had robbed one of the girlfriend's clients, and threatened to kill the couple if they ever reported him to the police.  Taylor would come to their house on weekends, accompanied by friends, among whom was petitioner (who was also the girlfriend's cousin).

On a particular occasion, petitioner came to their house with another companion of Taylor (a former codefendant) and three women.  Taylor joined them.  The six of them essentially commandeered the home for a party, disregarding the couple's request that they turn the music down.  The couple retreated to the garage, where they called the police using a neighbor's phone.  The police broke up the party and ejected petitioner's group from the home.

Two days later, petitioner, Taylor, the former codefendant, and their female companions were bowling together and playing video games when they all decided to descend upon the unlucky couple around 1:30 a.m., arriving in several cars.  The couple

2

were naked in bed, having locked the front door and the bedroom door. They heard the sound of glass breaking and people rushing into the house. Taylor forced open the bedroom door. Taylor accused the victim of calling the police two nights earlier, and repeatedly punched him before he and the former codefendant dragged the victim out of the room. The girlfriend asked petitioner, who was standing nearby, why he was doing this. Petitioner said it was because the couple had called the police, and walked out of the bedroom.

A neighbor witnessed the victim being shot in the driveway by one of the group. The victim was shot at close range in the back through the heart. The neighbor heard a woman's voice saying they should all leave. The shooter went back into the house, came out with a woman, and drove off. The rest drove off in the other cars. The group reconvened at the home of one of the women to discuss the incident.

The girlfriend identified petitioner, Taylor, and the former codefendant as being involved, and picked out the three from photo lineups. Taylor and petitioner did not testify at trial, and the former codefendant did not appear as a witness. The three women who had been present at the house testified for the defense. They claimed neither Taylor (whom one of them married after his arrest) nor petitioner carried guns, and that it was the absent former codefendant who broke through a window to effect entry into the victim's house and had boasted afterward of shooting the victim. They claimed that Taylor was in tears after the shooting of the victim.

In closing arguments at trial, the prosecutor conceded he could not prove the identity of the shooter. He urged the jury to return verdicts of first degree murder for the aiding and abetting of a premeditated murder. In support, he noted the previous death threat, which he asserted was not mere hyperbole in this demiworld. The prosecutor argued that the outcome of breaking into a house in the middle of the night was going to be the death of someone inside. Since the former codefendant was a friend of the group, the group would have been well aware that he was likely to shoot the victim. In the

3

prosecutor's view, the only reason to drag the victim out of the house rather than continue to beat him inside was to kill him; even the victim seemed to know this as he clung to the doorknob of his bedroom as they dragged him away. The prosecutor also noted the deliberate manner of the shooting, terming it execution style. Moreover, the fact that the group reconvened meant the death was not unexpected. If, however, the jury truly believed the defense witnesses that the shooting was unexpected (which was not likely under all of the circumstances), then it should find defendants guilty of second degree murder as a natural and probable consequence of aiding and abetting a target crime of assault likely to produce great bodily injury, because *any* reasonable person should have expected the shooting to be a likely consequence of the invasion and beating.

In our prior opinion, we rejected a challenge to the sufficiency of the evidence to support the natural and probable consequences theory.[2] We first noted that under *People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129 (*Guiton*), the defendants' failure to challenge the sufficiency of the evidence under the aider and abettor theory of liability for premeditated murder mooted the claim of insufficiency under the natural and probable consequences theory because we could presume the jury based its verdict on the sufficient theory absent evidence to the contrary. We then found that the jury in any event must have rejected the natural and probable consequences theory of liability as a basis for its verdicts because "the prosecut[or] [had] made clear in closing argument, [that] if defendants were responsible for [the victim]'s murder under the natural and probable consequences doctrine . . . , the most serious crime of which the jury could have convicted them was *second degree* murder." (*Sellers, supra,* C045032 [pp. 13-14].) We explained this reasoning was premised on the inconsistency of a target offense (assault) with premeditation. Gauging the sufficiency of the evidence of premeditation in an

---

**2** Defendants did not challenge the sufficiency of the evidence to support aider and abettor liability under a theory of premeditated murder.

abundance of caution, we agreed that the fact the whole group reconvened along with the alleged shooter (whomever it might be) seriously undercut any claim that the shooting took any of the group by surprise.

*Chiu* was decided in 2014. To get to its bottom line, it held that a murder conviction premised on the natural and probable consequences doctrine was limited to second degree murder, even if the direct perpetrator is guilty of premeditated first degree murder. (*Chiu*, *supra*, 59 Cal.4th at p. 166.) At the time petitioner sought the three writs in 2017, it had not been determined *by the Supreme Court* whether *Chiu* was retroactive. In 2017, shortly after petitioner sought the writ in the Supreme Court, it determined in *Martinez* that *Chiu* in fact had retroactive effect. (*Martinez*, *supra*, 3 Cal.5th at p. 1222.)

**DISCUSSION**

**1.0    The Writ Petition was Timely**

The People contend that by waiting until three years after *Chiu* to seek relief in habeas corpus, petitioner's delay in seeking relief was unjustified and therefore bars consideration of his claim because he did not offer any allegations in his petition of good cause for it. (E.g., *In re Clark* (1993) 5 Cal.4th 750, 759, 765.)

In petitioner's 2017 filing in the Supreme Court, he described (incorrectly) *Chiu* as newly decided, and then in his supporting argument asserted timeliness was immaterial because our prior opinion decided that he was convicted of premeditated first degree murder and therefore *Chiu* did not apply (going on to make other arguments). However, in his traverse in *this* court, counsel denies that his filing was untimely, and in a supporting affidavit petitioner asserts that he was unaware of *Chiu* until an inmate working in the law library told him about it in 2017.

Petitioner argues that the Supreme Court's issuance of an order to show cause before this court shows that the Supreme Court found his filing timely, citing *In re Hamilton* (1999) 20 Cal.4th 273, 283, footnote 5. The *Hamilton* case, however, is a thin reed upon which to lean. The court noted that its ordinary practice was to resolve

5

procedural issues before issuing an order to show cause (in the language that defendant quotes), but it explained *further* that it generally did so *solely on the pleadings*. Because it wanted to establish standards for timeliness in capital cases, it departed from this practice and *included in the order to show cause* a particular direction to address timeliness, as to which the defendant included averments in his traverse. (*Ibid*.; accord, *In re Robbins* (1998) 18 Cal.4th 770, 789 [the inadequacy of allegations of timeliness would result in finding that delay unjustified, but issuance of order to show cause including issue of timeliness allows consideration of allegations in traverse].) That is not the situation in the present case, where petitioner's pleadings did not establish timeliness on their face, the People's informal response did not refer to timeliness at any point, and the order to show cause did not include the timeliness of the petition as an issue.

In short, it appears the issue of timeliness is open to our consideration in the first instance. However, as the People raised the issue of timeliness for the first time in their return, it would be proper to consider petitioner's response in his traverse regarding good cause that he was unaware of *Chiu* until told of the decision by someone else.

Petitioner first argues his filings were timely because they preceded *Martinez*, which was not decided until late in 2017. However, his own petition references *In re Lopez* (2016) 246 Cal.App.4th 350, 358, which a year earlier found that *Chiu* was retroactive, and two cases noted subsequently that the People did not really dispute the issue because it was evident that *Chiu* should be retroactive. (*In re Brigham* (2016) 3 Cal.App.5th 318, 327, fn. 4; *In re Johnson* (2016) 246 Cal.App.4th 1396, 1404, fn. 2.) We have not found any authority to the contrary before *Martinez* confirmed that *Chiu* was retroactive such that it was warranted to await that decision.

This leaves the excuse in petitioner's traverse. Even a substantial delay can be excused for good cause. (*In re Reno* (2012) 55 Cal.4th 428, 460.) Delay is measured from the date a petitioner knew, or reasonably should have known, of the legal basis for a claim. (*In re Nunez* (2009) 173 Cal.App.4th 709, 723.) In *Nunez*, which asserted that

6

there was not any reason to suppose that the petitioner would have been aware of a denial of review of his direct appeal, timeliness was measured from the date habeas counsel contacted him about the unconstitutionality of his sentence—which was only six months before counsel filed the petition—and therefore it was timely. (*Ibid.*) Similarly, we do not have any basis to suppose petitioner—whom the People do not suggest has any legal training—would be tracking Supreme Court decisions in general or one that overturned a nuanced legal theory that defendant might not even have realized played a part in his trial until an inmate working in the law library told him so in 2017, after which his filing for habeas corpus promptly followed. The People do not suggest his traverse is anything other than sincere. We therefore do not find the petition barred as untimely. (*In re Hampton* (2020) 48 Cal.App.5th 463, 474-476.)

## 2.0 The *Chiu* Instructional Flaw is Not Harmless Beyond a Reasonable Doubt

As the People concede at the outset, the court instructed the jury on two theories of murder: direct aider and abettor liability for premeditated murder, and liability for a murder as the result of an escalation from assault likely to inflict great bodily injury under the natural and probable consequences doctrine.[3] It was also instructed on the degrees of murder. However, nothing in the *instructions* expressly *precluded* the jury from applying the natural and probable consequences doctrine to first degree murder, which would transgress the retroactive proscription in *Chiu* and *Martinez*.

The case of *Guiton, supra*, 4 Cal.4th at pages 1128-1129, established the standard of review for instructional error: absent evidence to the contrary, we presume a jury chose a factually sufficient theory in instructions over insufficient factual alternatives, but we cannot presume a jury chose a legally correct theory over an incorrect theory. *People v. Aledamat*

---

[3] The court instructed on this theory (without objection from the parties) after finding that the evidence supported an inference defendants intended to assist or encourage the target offense of assault, and that under all the circumstances it was reasonable to find that a murder was a foreseeable result of the assault.

(2019) 8 Cal.5th 1 (*Aledamat*), the subject of our request for supplemental briefing from the parties, refined the latter standard. (*Id*. at pp. 7-8.) It found the Court of Appeal had read *Guiton* too strictly with respect to erroneous *legal* theories, which had not been at issue in *Guiton*; the test for harmless error is *not* whether the record showed that the jury *in fact* relied on the valid legal theory, e.g., as reflected in another finding. (*Aledamat*, at p. 9.) Rather, reversal is required unless the reviewing court can conclude after an examination of the *entire record* that the jury relied on the proper theory beyond a reasonable doubt (rather than its review being limited to just the verdict); *Aledamat* did not prescribe any particular method for making this determination. (*Id*. at p. 13.)

To establish harmless error, the People rely on a false analogy to the principle that a prosecutor's election in closing argument of the *factual* basis for the charges forecloses a need to instruct on jury unanimity in selecting the factual base for the charges. (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.) They argue, premised on this false analogy, that the prosecutor's argument clearly indicated to the jury that a verdict under the natural and probable consequences theory was limited to second degree murder. However, unlike the power of the prosecution to choose the *facts* on which it wishes to rest its case, instructions on the *law* governing the case are solely within the court's province, and there is a pattern instruction to this effect that the trial court employed and reiterated. (*Ibid*.) As a result, a jury is not limited in deliberations to the legal theories a prosecutor advances. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

The arguments of counsel thus cannot fill a lacuna in the instructions (*Carter v. Kentucky* (1981) 450 U.S. 288, 304 [67 L.Ed.2d 241, 253]), nor can they prevail over contrary instructions. They may, however, be considered in determining how the jury may have interpreted ambiguous instructions. (*Middleton v. McNeil* (2004) 541 U.S. 433, 438 [158 L.Ed.2d 701, 708]).) To the extent we can consider the instructions to be ambiguous rather than incomplete, the prosecutor's arguments do have *some* value in

8

assessing how the jury went about its task, but they are not a *determinative* indication of the course the jury actually took.

We also reject a peg on which petitioner hangs a chunk of argument in his supplemental briefing. The jury failed to sustain an armed enhancement (Pen. Code, § 12022, subd. (a)(1))[4], from which tea leaves petitioner construes implications that the jury necessarily relied on the natural and probable consequences doctrine. This is not the law. We do not accord *any* meaning to either acquittals or unsustained enhancements, because their significance is unfathomable with respect to the verdicts that are actually returned. (*People v. Lewis* (2001) 25 Cal.4th 610, 655-656; *People v. Carter* (2019) 34 Cal.App.5th 831, 843.)

The holding in our prior opinion was limited to petitioner's forfeiture of his claim that insufficient evidence supported liability under a theory of natural and probable consequences, to which we added our conclusion in dictum that in any event we did not think this was the likely basis of the verdict.[5] However, we were not required to determine which theory that one or more of the jurors followed in returning a verdict of first degree murder. The problem, ultimately, is the overlap of the evidence of petitioner's intent to aid in a premeditated murder and the evidence that while petitioner believed he was merely participating in an assault the murderous outcome was reasonably foreseeable. To elaborate upon our somewhat truncated analysis in our prior opinion on this point, an aider/abettor of an assault pre-*Chiu* could be liable for a planned murder on the part of the direct perpetrator that was undisclosed, where objective circumstances

---

[4] Undesignated statutory references are to the Penal Code.

[5] However, in the course of rejecting petitioner's challenge to his sentence as excessive punishment, the trial court—which, unlike this court, had a firsthand view of the trial— came to the conclusion that the evidence and jury questions indicated to it that the jury based its verdicts on the natural and probable consequences doctrine, a crime in which petitioner nonetheless had "major" responsibility.

would make this a reasonably foreseeable consequence of the assault. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531-532, cited in *Chiu*, *supra*, 59 Cal.4th at pp. 165-166.) Discerning the intent of a defendant is a quintessential question of fact. Even looking at the record as a whole, we do not have any way of determining whether the jury concluded this evidence inferentially established petitioner's willing participation in a planned homicide, or simply established that petitioner blinded himself to the reasonable chance that the assault in which he agreed to participate would result in a homicide. We do not see how the prosecutor's argument would *foreclose* the jury from selecting the latter course to first degree murder, because he was simply expressing his opinion of the evidence, nor does it offer any guidance on which path the jury in fact chose. As a result, we have a reasonable doubt that the jury's verdict was free from *Chiu* error.

## 3.0 The Second Set of Supplemental Briefing Regarding Remedy

In the Legislature's ongoing ameliorative efforts in the field of criminal law, it has amended sections 188 and 189, effective 2019. (See Stats. 2018, ch. 1015, §§ 2-3.) The effect of these amendments to the murder statutes "modified California's felony murder rule and natural and probable consequences doctrine to ensure murder liability is not imposed on someone unless they were the actual killer, acted with the intent to kill, or acted as a major participant in the underlying felony and with reckless indifference to human life." (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 220.) The legislation also added a new statute, section 1170.95 (Stats. 2018, ch. 1015, § 4), "which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in [murder] law would affect their *previously sustained convictions*." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722-723, italics added (*People v. Martinez*).)

Petitioner requested a second round of supplemental briefing in October 2019 on the effect of the September 2019 version of *In re Cobbs* (2019) 41 Cal.App.5th 1073 (*Cobbs*) on his remedy for *Chiu* error in light of these statutory amendments. The People filed their supplemental briefing first. They urged us to decline to follow the September

10

version of *Cobbs*, which had directed that the section 1170.95 proceedings should take place *before* any retrial. They claim putting a section 1170.95 proceeding first would interfere with their right to a jury trial, and present procedural complications. Petitioner concurred in the People's objections, with one "exception" and one "addition": the exception noted certain double jeopardy implications with a subsequent retrial, and the addition noted that interjecting a section 1170.95 proceeding first was not in accord with the remedy that *Chiu* prescribed, which simply remanded with directions for the People to decide how they wished to proceed.

In our opinion *on rehearing* in *Cobbs* in November 2019 (the presently published version), we reiterated that the petitioner's right to seek resentencing pursuant to section 1170.95 in the trial court did not apply to the remedy available under his pending habeas corpus proceeding (much as § 1170.95 precluded application of the changes in the murder statutes in pending appeals (*People v. Martinez*, *supra*, 31 Cal.App.5th at pp. 729-730)). Our disposition in *Cobbs*, however, now simply followed the remedy prescribed in *Chiu*: we vacated the murder conviction and remanded to the trial court to allow the People to elect whether to accept a reduction of the conviction to second degree murder or retry the petitioner for first degree murder (at which time the amendments to the murder statutes would apply prospectively), *after which* the section 1170.95 proceeding would be available if warranted. (*Cobbs*, *supra*, 41 Cal.App.5th at pp. 1080, 1081-1082.) We thus eliminated the language to which both the People and petitioner objected in the supplemental briefing in the present case. We therefore will apply the disposition from *Cobbs*.

## DISPOSITION

For the reasons stated above, the petition for habeas corpus is granted. We vacate petitioner's conviction for first degree murder and remand the matter to the trial court. The People shall elect within 30 days whether to accept a conviction of second degree murder (at which point the trial court shall enter a new judgment and resentence

11

petitioner accordingly), or to retry petitioner for first degree murder under the present versions of sections 188 and 189.

/s/
BUTZ, J.[*]

We concur:

/s/
RAYE, P. J.

/s/
RENNER, J.

[*] Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.